DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
COLLEEN M. KEATING (Cal. Bar No. 261213)
Email: keatingc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>        vs.<br><br>ANTHONY TODD JOHNSON (aka TODD JOHNSON), JEREMY JOHNSON, RICHARD PORTILLO, CHARLES LLOYD, MARK HECKELE, MICHAEL  GREGORY, SMART INITIATIVES, LLC, VALLEY VIEW ENTERPRISES LLC, TARGET EQUITY LLC, ZABALA FARMS GROUP, LLC, C-QUADRANT LLC, GPA ENTERPRISES LLC, RJ HOLDINGS GROUP, LLC, EXTRACTION CAPITAL TIER 1, LLC, GREEN GROWTH VENTURES, LLC, GREEN BUD INITIATIVES LLC, CIS MARKETING, LLC, AND LLOYD MARKETING, LLC,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.      This action involves securities offering fraud by nine issuer entities (the "issuers") and their respective principals and control persons that raised over $25 million from more than 400 investors located in multiple states between September 2017 and February 2019 to ostensibly finance two marijuana related businesses.

5.      Five of the issuer defendants – Smart Initiatives, LLC, Valley View Enterprises LLC, Target Equity LLC, Zabala Farms Group, LLC, and Green Growth Ventures, LLC – raised approximately $12.3 million from approximately 226 investors for the stated purpose of investing in a newly established and licensed marijuana farm located in Salinas, California.

6.      The other four issuer defendants – C Quadrant LLC, GPA Enterprises LLC, RJ Holdings Group, LLC, and Extraction Capital Tier 1, LLC – raised

approximately $13.2 million from approximately 211 investors for the stated purpose of developing C-Quadrant, a startup cannabidiol ("CBD") extraction facility, also located Salinas, California.

7.      In soliciting investor funds to invest in the marijuana farm and the CBD extraction facility, defendants Todd and Jeremy Johnson, who were the principals and control persons of six of the issuers, and defendants Richard Portillo, Charles Lloyd, and Mark Heckele, who were the principals and control persons of the other three issuers, misled and deceived actual and prospective investors about the profits they could expect to realize on their investments, claiming that the investments would generate annual returns of 100% or more.

8.      In addition, the Johnsons deceived investors as to how their monies would be used, misrepresented their compensation, and misappropriated at least $2.7 million of investor money.

9.      The Johnsons and defendant Michael Gregory, an additional principal and control person of C-Quadrant, also misled and deceived investors about a purported "business loan," secured by C-Quadrant's real property, that would be used to develop C-Quadrant's CBD extraction facility.

10.      Rather than using that business loan for the benefit of C-Quadrant, Gregory used the loan proceeds to pay off different investors in an entirely unrelated entity.

11.      To further generate investor interest in their various offerings, the Johnsons, Gregory, and Portillo also made material misrepresentations to investors and prospective investors about their financial and business backgrounds.

12.       Gregory and Portillo also misled and deceived investors by claiming they had made large personal capital contributions to their respective issuers, when in fact they had not.

13.      The Johnsons and Gregory also misled and deceived investors by falsely claiming that C-Quadrant had a business and research relationship with a prominent

California university.

14.    The Johnsons, Portillo, Lloyd, Heckele, and the defendant marketing entities – Green Bud Initiatives LLC, CIS Marketing, LLC, and Lloyd Marketing, LLC – acted as unregistered broker-dealers in connection with the offerings, none of which were registered with the Commission, and used general solicitation to attract prospective investors, including via cold calls, Craigslist, Facebook, and other websites and social media.

15.    None of the securities offerings were registered with the Commission as required by the Securities Act.

16.    Hence, investors were not provided with the information that a registration statement is required to provide for the protection of investors.

17.     In addition, many of the investors in each offering were unaccredited and unsophisticated.

18.    The defendants did not take reasonable steps to verify the investors' accreditation status.

19.    Through their conduct, and as further detailed herein, defendants violated the registration provisions of Section 5 of the Securities Act, the antifraud provisions of Section 17(a) of the Securities Act, Section 10b of the Exchange Act and Rule 10b-5 thereunder, and/or the broker registration provisions of Section 15 of Exchange Act.

20.    The SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against defendants, as detailed in its prayer for relief.

## THE DEFENDANTS

**A. Todd and Jeremy Johnson, Michael Gregory, and Their Issuer-Entities**

21.    **Anthony Todd Johnson** (aka Todd Johnson), age 52, resides in Winchester, California.  At all relevant times he was a managing member and the chief executive officer of Smart Initiatives, Valley View, Target Equity, ZFG, GPA,

and GBI Marketing, and a managing member and the chief revenue officer of C-Quadrant.  He has never held any securities licenses and has never been registered with the Commission in any capacity.

22.   **Jeremy T. Johnson**, age 42, resides in Murrieta, California and is Todd Johnson's brother.  At all relevant times Jeremy Johnson was a managing member and the chief operating officer of Smart Initiatives, Valley View, Target Equity, ZFG, GPA, C-Quadrant, and GBI Marketing.  At all relevant times Jeremy Johnson was not registered with the Commission in any capacity and held no securities licenses.

23.   **Michael R. Gregory**, age 38, resides in Santa Ana, California.  At all relevant times he was a managing member and the chief executive officer of C-Quadrant.  Gregory has never held any securities licenses and has never been registered with the Commission in any capacity.

24.   **Smart Initiatives, LLC** ("Smart Initiatives") is a California limited liability company with its principal place of business in Temecula, California.  Smart Initiatives was created by the Johnsons in approximately August 2017. At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

25.   **Valley View Enterprises LLC** ("Valley View") is a California limited liability company with its principal place of business in Temecula, California.  Valley View was created by the Johnsons in approximately October 2017. At all relevant times, no registration statement was filed or in in effect with respect to its securities offerings.

26.   **Target Equity LLC** ("Target Equity") is a California limited liability company with its principal place of business in Temecula, California.  Target Equity was created by the Johnsons in approximately February 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

27.   **Zabala Farms Group, LLC**  ("ZFG") is a Delaware limited liability company with its principal place of business in Temecula, California.  ZFG was

created by the Johnsons in approximately June 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

28.    **GPA Enterprises LLC** ("GPA") is a California limited liability company with its principal place of business in Temecula, California.  GPA was created by the Johnsons in approximately January 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

29.    **C Quadrant LLC** ("C-Quadrant") is a California limited liability company with its principal place of business in Santa Ana, California.  C-Quadrant was created by the Johnsons and Gregory in approximately January 2018.  At all relevant times, no registration statement was filed in effect with respect to its securities offerings

30.    **Green Bud Initiatives LLC** ("GBI Marketing") is a California limited liability company with its principal place of business in Temecula, California.  GBI was created by the Johnsons in approximately January 2018.  GBI Marketing has never been registered with the Commission in any capacity.

## B. Richard Portillo and His Entities

31.    **Richard A. Portillo**, age 46, resides in Carmel Valley, California.  At all relevant times he was a managing member of RJ Holdings Group, LLC and CIS Marketing, LLC.  He has never held any securities licenses and has never been registered with the Commission in any capacity.

32.    **RJ Holdings Group, LLC** ("RJ Holdings") is a California limited liability company with its principal place of business in Temecula, California.  Portillo created RJ Holdings in approximately January 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

33.    **CIS Marketing, LLC** ("CIS Marketing") is a California limited liability company with its principal place of business in Carmel Valley, California.  Portillo created CIS Marketing in approximately February 2018.  CIS Marketing has never been registered with the Commission in any capacity.

COMPLAINT                                                      6

### C. Charles Lloyd, Mark Heckele, and Their Entities

34.     **Charles Lloyd**, age 48, resides in Tucson, Arizona.  At all relevant times he was a managing member of GGV, ECT1, and Lloyd Marketing.  He has never held any securities licenses and has never been registered with the Commission in any capacity.

35.     **Mark W. Heckele**, age 40, resides in Tucson, Arizona.  At all relevant times he was a managing member of GGV and ECT1.  Heckele, a practicing attorney, is a member of the Arizona State Bar.  He has never held any securities licenses and has never been registered with the Commission in any capacity.

36.     **Green Growth Ventures, LLC** ("GGV") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  Lloyd and Heckele created GGV in approximately March 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

37.     **Extraction Capital Tier 1, LLC** ("ECT1") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  Lloyd and Heckele created ECT1 in approximately January 2018.  At all relevant times, no registration statement was filed or in effect with respect to its securities offerings.

38.     **Lloyd Marketing, LLC** ("Lloyd Marketing") is an Arizona limited liability company, created by Lloyd in approximately January 2011, with its principal place of business in Tucson, Arizona.  Lloyd Marketing has never been registered with the Commission in any capacity.

## THE ALLEGATIONS

**A.    Todd and Jeremy Johnson, Michael Gregory, and Their Unregistered and Fraudulent Securities Offerings.**

39.     Todd and Jeremy Johnson, directly and indirectly, exercised day-to-day control over Smart Initiatives, Valley View, Target Equity, and ZFG, and, directly and indirectly, controlled and conducted the unregistered securities offerings by each of those entities, all for the stated purpose of raising investor funds to invest in a

newly established and licensed marijuana farm located in Salinas, California.

40.     Todd and Jeremy Johnson, directly and indirectly, exercised day-to-day control over GPA, and, directly and indirectly, controlled and conducted the unregistered securities offering of GPA for the stated purpose of raising investor funds to invest in C-Quadrant's CBD extraction facility, also located in Salinas, California.

41.     Todd and Jeremy Johnson, together with Gregory, directly and indirectly exercised day-to-day control over C-Quadrant, and, directly and indirectly, controlled and conducted the unregistered securities offering of C-Quadrant for the stated purpose of raising investor funds to invest in C-Quadrant's CBD extraction facility.

42.     Each of the unregistered offerings constituted an offer and sale of securities, in the form of investment contracts, in that they each involved the offer to purchase fractional interests or "membership units" in the issuer that involved: (a) an investment of money; (b) in a common enterprise; and (3) with an expectation of profits to be derived solely from the efforts of others.

43.     The private placement memoranda for each of the offerings stated that the issuer-company's business would be substantially dependent on the management teams of both the issuer company and the Salinas marijuana farm or C-Quadrant's extraction facility.

44.     With respect to each of the unregistered securities offerings, investor funds were pooled, and the investors' expectation of profits were interwoven with and dependent upon the success of the managers of both the issuer company and the Salinas marijuana farm or C-Quadrant's CBD extraction facility.

45.     Each of the private placement memoranda for the Smart Initiatives, Valley View, Target Equity, ZFG, GPA and C-Quadrant offerings referred to the memberships units as "securities" and offered the same class of securities (*i.e.*, "membership units") in exchange for the same type of consideration (*i.e.*, cash).

### 1. The Johnsons' Multiple Fraudulent Offerings for the Marijuana Farm in Salinas

46.     From September 2017 through February 2019, the Johnsons, through the four defendant issuers they created and controlled, namely Smart Initiatives, Valley View, Target Equity and ZFG, raised approximately $12.2 million from approximately 210 investors located in multiple states, for the Salinas marijuana farm.

47.     Through the Smart Initiatives offering, using a private placement memorandum dated September 14, 2017, with a maximum offering amount of $2.25 million, the Johnsons raised approximately $2.729 million from approximately 60 investors located in multiple states.

48.     Through the Valley View offering, using a private placement memorandum dated October 30, 2017, with a maximum offering amount of $4.25 million, the Johnsons raised approximately $4.745 million from approximately 101 investors located in multiple states.

49.     Through the Target Equity offering, using private placement memoranda dated February 8, 2018 and March 13, 2018, with a maximum offering amount of $4.7 million, the Johnsons raised approximately $3.877 million from approximately 44 investors located in multiple states.

50.     Through the ZFG offering, using a private placement memorandum dated July 12, 2018, with a maximum offering amount of $6 million, the Johnsons raised approximately $214,500 from approximately five investors, located in multiple states.

51.     The Johnsons commingled some of the investor funds from the offerings including by transferring funds between the issuers and by maintaining a single bank account for Target Equity and ZFG.

52.     The Johnsons also deposited investor funds in the Target Equity and ZFG offerings in a single bank account that they maintained and controlled.

53.     Jeremy Johnson drafted the private placement memoranda for Smart Initiatives and Valley View and the original Target Equity private placement memorandum.

54.     Todd Johnson assisted his brother, Jeremy Johnson, in drafting the private placement memoranda for Smart Initiatives and Valley View and the original Target Equity private placement memorandum.

55.     Both Todd and Jeremy Johnson had ultimate authority over the statements contained in the private placement memoranda for Smart Initiatives and Valley View and the original Target Equity private placement memorandum.

56.     After receiving a subpoena from the Commission in February 2018, the Johnsons retained securities counsel, who drafted supplemental private placement memoranda for Smart Initiatives, Valley View, and Target Equity and the private placement memorandum for ZFG.

57.     Jeremy Johnson had ultimate authority over the statements contained in the supplemental private placement memoranda for Smart Initiatives, Valley View and Target Equity, and the ZFG private placement memorandum.

58.     Each of the private placement memoranda for Smart Initiatives, Valley View, Target Equity and ZFG was created and used for the purpose of soliciting investors.

### 2.     The Johnsons' and Gregory's Fraudulent and Unregistered Offerings for C-Quadrant's Extraction Facility

59.     Between January 2018 and at least February 2019, the Johnsons and Gregory, through two unregistered C-Quadrant offerings, with a maximum offering amount of $30 million and $10 million respectively, raised approximately $942,500 from approximately 15 investors located in multiple states, for the stated purpose of developing C-Quadrant's extraction facility.

60.     Between January and November 2018, the Johnsons, through their unregistered GPA offering, which in turn fed into C-Quadrant, with a maximum

offering amount of $15 million, raised approximately $6,577,300 from approximately 83 investor located in multiple states.

61.    C-Quadrant conducted its first offering in January 2018.

62.    Jeremy Johnson was responsible for approving C-Quadrant's January 2018 private placement memorandum distributed to investors, and had ultimate authority over its contents.

63.    Both Todd Johnson and Gregory reviewed and approved C-Quadrant's January 8, 2018 private placement memorandum.

64.    The private placement memorandum for C-Quadrant's second offering, dated January 15, 2019, was approved by Jeremy Johnson.

65.    Jeremy Johnson prepared and had final approval over GPA's private placement memorandum dated January 8, 2018.

66.    Each of the private placement memoranda for C-Quadrant and GPA was created and used for the purpose of soliciting investors.

### 3.    General Solicitation of Investors

67.    Each of the Smart Initiatives, Valley View, Target Equity, ZFG, GPA and C-Quadrant offerings involved the general solicitation of investors and prospective investors.

68.    The Johnsons purchased lead lists and supervised an in-house sales team that cold-called prospective investors for all of the above offerings.

69.    The Johnsons also solicited investors online using GBI Marketing's website, Facebook, Craigslist ads, and YouTube videos, among other things.

70.    Todd and Jeremy Johnson personally communicated with prospective investors about the offerings, including during phone calls and tours of the Salinas marijuana farm and C-Quadrant's extraction facility.

71.    Gregory led tours of C-Quadrant's extraction facility for prospective investors.

72.    The offering materials sent to prospective investors for the Smart

Initiatives, Valley View, Target Equity, ZFG and GPA offerings included a questionnaire regarding accreditation status, but the Johnsons and Gregory did not take any steps to verify investors' accreditation status or that all purchasers were, in fact, accredited.

73.   Based on the issuers' records, at least 150 non-accredited investors invested in the Smart Initiatives, Valley View, Target Equity, and ZFG offerings, and at least 26 non-accredited investors invested in the GPA offering.

74.   In addition, the three defendant issuers that invested in C-Quadrant – GPA, RJ Holdings, and ECT1 – were non-accredited as they were formed for the sole purpose of investing in the first C-Quadrant offering and not all of the respective members of GPA, RJ Holdings and ECT1 were accredited investors.

75.   Furthermore, neither the Johnsons nor Gregory attempted to verify the accreditation status of C-Quadrant's individual investors at the time of their investments.

76.   None of the investors or prospective investors in the Smart Initiatives, Valley View, Target Equity, ZFG, GPA and C-Quadrant offerings, prior to the sale of the securities, were furnished with audited balance sheets of the issuers.

### 4.   The Fraud

#### a)   The Johnsons Misled and Deceived Investors Regarding Their Compensation and Their Misappropriation of Investor Funds

77.   Todd and Jeremy Johnson misled and deceived investors regarding their compensation and misappropriated at least  $2.7 million of investor funds, contrary to representations regarding the use of proceeds in the Smart Initiatives, Valley View, Target Equity, ZFG, and GPA private placement memoranda.

78.   Specifically, the Smart Initiatives, Valley View, original Target Equity, and the GPA private placement memoranda represented that "[t]here is no accrued compensation that is due any Member of management" and that the Johnsons would

1  receive a salary of "$0.00."

2      79.    Todd Johnson stated in a recorded presentation for prospective investors

3  in at least the Smart Initiatives and Valley View offerings, which were conducted in

4  the fall of 2017,  "even executives here at SI [Smart Initiatives] do not take a salary.

5  We all make our money just like you do, from the profits associated with this

6  project."

7      80.    The Smart Initiatives and Valley View private placement memoranda

8  disclosed that up to ten percent of investor funds could be used to pay broker-dealer

9  commissions, but they expressly stated that "[n]o compensatory sales fees or related

10 commissions will be paid to [the] Managing Members" and that commissions would

11 be paid only to *registered* broker-dealers, which Todd and Jeremy Johnson were not.

12     81.    The original Target Equity and GPA private placement memoranda

13 disclosed that ten percent of investor funds could be used to pay brokerage

14 commissions, but stated that "MANAGING PARTNERS WILL RECEIVE

15 COMPENSATION BASED SOLELY ON OWNERSHIP OF BUSINESS."

16     82.    Contrary to these representations, the Johnsons misappropriated at least

17 $2.7 million in investor funds, including by paying themselves unauthorized

18 transaction-based compensation in the form of undisclosed commissions and/or

19 management fees.

20     83.    The Johnsons transferred the misappropriated funds to themselves and to

21 GBI Marketing for their personal use and for purported business expenses of GBI

22 Marketing, whose sole business purpose was to raise investor funds for the Johnsons'

23 various offerings.

24     84.    With respect to the Smart Initiatives offering, the Johnsons

25 misappropriated for themselves and GBI at least $600,000 of investor funds.

26     85.    With respect to the Valley View offering, the Johnsons misappropriated

27 for themselves and GBI at least $495,000 of investor funds to which they were not

28 entitled.

COMPLAINT                                     13

86.     With respect to the Target Equity offerings, the Johnsons misappropriated for themselves and GBI at least $465,000 of investor funds.

87.     With respect to the GPA offering, the Johnsons misappropriated for themselves and GBI at least $1.15 million of investor funds.

88.     The Johnsons' misappropriation of millions of dollars of investor funds also included the misuse of the funds raised when they oversubscribed the Smart Initiatives and Valley View offerings.

89.     The Johnsons raised more than the maximum offering amounts disclosed in the Smart Initiatives and Valley View private placement memoranda.

90.     Rather than return those oversubscribed amounts to investors, or sending the oversubscribed amounts to the Salinas marijuana farm, they simply took the additional investor funds for their personal use.

91.     The Smart Initiatives offering was oversubscribed by approximately $480,000.

92.     The Valley View offering was oversubscribed by approximately $495,000.

93.     The Johnsons knew, or were reckless or negligent in not knowing that the Smart Initiatives and Valley View offerings were oversubscribed.

94.     Investors in both the Smart Initiatives and Valley View offering would have considered it important to their investment decision whether the Johnsons were keeping their oversubscribed amounts for themselves, rather than sending it to the Salinas marijuana farm for improvements as represented in the private placement memoranda.

95.     Investors in each of the offerings – Smart Initiatives, Valley View, Target Equity, ZFG, and GPA – would have considered it important to their investment decisions that the Johnsons were receiving and using their funds for personal use, or for purported business expenses, contrary to the representations made in the issuers' private placement memoranda.

b)   **The Johnsons Misled and Deceived Investors  Regarding Expected Returns on Investment**

96.     In all their offerings – Smart Initiatives, Valley View, Target Equity, ZFG, C-Quadrant and GPA – the Johnsons, both individually and through GBI Marketing, deceived investors and made material misrepresentations and omissions to investors regarding expected returns on investment.

97.     Although the Smart Initiatives and Valley View private placement memoranda stated that the expected returns on investment were projections, and the Target Equity, ZFG, C-Quadrant, and GPA private placement memoranda were silent regarding expected returns, the Johnsons and the sales team they supervised used materially misleading language when soliciting investors, telling investors and prospective investors they were guaranteed annual returns of 100, 150, or 200 percent, depending on the offering.

98.     For example, on November 16, 2017, Jeremy Johnson wrote to an investor, "Smart Initiatives offered 200% for each Unit" and "Valley View currently offers 150% for 1st 40 Units, then drops to 125% for final 30 Units."

99.     Jeremy Johnson sent an email on October 25, 2017 to his sales staff referring to "the 200% return enjoyed by" Smart Initiatives investors and stating that Valley View investors "will experience 150%."

100.    Jeremy and Todd Johnson authorized the use of a sales script claiming that Valley View was offering units "yielding 150% ROI" [return on investment] for early investors and "yielding 100% ROI" for later investors.

101.    The Johnsons' sales team, whom the Johnsons supervised, routinely sent emails to prospective Valley View investors with misleading statements such as "the payout right now is 150%" and "we are offering investors a 100% annual return."

102.    The Johnsons' sales team also sent emails to prospective Target Equity investors that misleadingly claimed, "we are offering investors a 100% annual return on their partner shares" and "the return on Target Equity is 100%."

103.   The Johnsons' sales team placed ads on Craigslist for ZFG that included language such as "100% Return on Farm Share!!" and "Easy Way to Make $100K Annually!!  Huge Return (100% ROI Projected)."

104.   The Johnsons' sales team also sent emails to prospective GPA and C-Quadrant investors that made misleading statements, such as, "This is a minimum $25,000 investment that earns $25,000 per year (100% returns)."

105.   Similarly, the website for defendant GBI Marketing, a marketing entity that the Johnsons controlled, falsely claimed that "Average expected returns are currently ranging from 100%-200% return on investment per year."

106.   The Johnsons' projections about expected returns on investment in the Salinas marijuana farm were ostensibly based on projections that required the Salinas marijuana farm to achieve approximately $30 million in net income in 2018, and each year thereafter.  To create these projections, the Johnsons used a pro forma profit and loss ("P&L") statement provided to them around August 2017 by a cofounder of the Salinas marijuana farm.

107.   As the Johnsons knew, or were reckless or negligent in not knowing, the Salinas marijuana farm had virtually no operating history, much less a history of making anywhere close to $30 million a year.

108.   In the December 2017/January 2018 timeframe, the cofounder of the Salinas marijuana farm learned that the Johnsons had misused the pro forma P&L statement to provide return on investment projections to investors and prospective investors, and told the Johnsons they could not use the information in the P&L statement to solicit investors.

109.   Notwithstanding that admonishment, the Johnsons and their sales teams continued to use those pro forma numbers to solicit investors and prospective investors with the promise of 100% to 200% annual returns.

110.   In or around February 7, 2018, the cofounder of the Salinas marijuana farm sent the Johnsons a confidential revised pro forma P&L statement that adjusted

the farm's projected net income significantly downward, from a range of $23 to 37 million per year to a range of just $6 – $23 million per year.

111.   In an email dated February 7, 2018, the cofounder of the Salinas marijuana farm told the Johnsons that the revised pro forma, which the cofounder described as a "working P&L," was incomplete, contained possible miscalculations and incorrect assumptions, was based on speculation, and did not reflect "real or actual numbers."

112.   After receiving the revised pro forma the Johnsons knew, or were reckless or negligent in not knowing, that even under a best-case scenario, the Salinas marijuana farm would not produce the returns they had been touting – and continued to tout – to investors.

113.   During the Target Equity offering – and in advance of the ZFG offering – the Johnsons had concrete information demonstrating that their return on investment projections were materially misleading: the Salinas marijuana farm made only nominal distributions in 2018, not remotely close to the annual 100%  or more returns that the Johnsons and their sales team had told investors to expect.

114.   Despite knowing all of this, the Johnsons and the sales team they supervised continued to raise money in the Target Equity and ZFG offerings through at least October 2018 using "projections" or "estimates" of 100 percent annual returns.

115.   Each of the private placement memoranda for Smart Initiatives, Valley View and ZFG stated that distributions would be made on a quarterly basis, subject to the discretion of the managing members, as did the supplemental Target Equity private placement memorandum.

116.   Although the original private placement memorandum for Target Equity was silent on the issue, investors and prospective investors were told by email that they would receive quarterly distributions.

117.   Investors in each of the offerings – Smart Initiatives, Valley View,

Target Equity, ZFG, and GPA – would have considered it important to their investment decisions whether they would receive quarterly distributions.

118.   Contrary to the Johnsons' representations to investors that they could expect quarterly distributions, the cofounder of the Salinas marijuana farm had not agreed with the Johnsons to make quarterly distributions, much less quarterly distributions in the amounts being touted by the Johnsons and their sales team.

### c)   Jeremy Johnson's Undisclosed Bankruptcy

119.   The private placement memoranda for the Smart Initiatives, Valley View, Target Equity, ZFG, GPA, and C-Quadrant offerings contained glowing biographies of Todd and Jeremy Johnson but failed to disclose that Jeremy Johnson had filed for bankruptcy in 2012 under Chapter 7 of the Bankruptcy Code.

120.   For example, the private placement memoranda for these offerings described Jeremy Johnson as a "highly skilled sales leader and entrepreneur" and a "seasoned expert running profitable call centers and internet start-ups."

121.    These descriptions of Jeremy Johnson's supposedly successful financial and business background were materially misleading in light of the omission of his then-recent personal bankruptcy.

122.   The Johnsons knew, or were reckless or negligent in not knowing, that they had failed to disclose Jeremy Johnson's bankruptcy,

### d)   The Johnsons and Gregory Misled and Deceived
### Investors About  C-Quadrant's "Business Loan"

123.   The Johnsons and Gregory misled and deceived prospective and actual investors in C-Quadrant and GPA regarding what Gregory falsely described as a "business loan" to facilitate the company's development.

124.   Though in their communications with prospective and existing investors the Johnsons and their sales team touted C-Quadrant's ownership of the property, the Johnsons and Gregory failed to disclose that they had collateralized C-Quadrant's

property and that Gregory had used the loan proceeds to pay off investors in an unrelated entity.

125.  In early 2018, C-Quadrant purchased a former recycling plant, where it planned to locate its extraction facility.

126.  In October 2018, prior to the start of the second C-Quadrant offering, the Johnsons and Gregory transferred ownership of the property to another entity they controlled and used it as collateral for an almost $2.9 million loan.

127.  Gregory used the majority of the loan proceeds to make payments to investors in an unrelated cannabis farm that he owned.

128.  Gregory prepared investor updates dated December 2018 and February 2019 reporting that C-Quadrant had "taken a business loan . . . needed to get us through our growth."

129.  As the Johnsons and Gregory knew, or were reckless or negligent in not knowing, those representations in the investor updates were false and materially misleading because, in or about November 2018, Gregory used the loan proceeds to pay investors in another entity.

130.  The investor updates were also materially misleading because they failed to disclose that C-Quadrant's property had been collateralized to secure the loan.

131.  In addition, the Johnsons made statements in a video, which was posted on Vimeo.com in January 2019 and sent to prospective investors in the second C-Quadrant offering, that were materially misleading as they emphasized C-Quadrant's purchase of the property while failing to disclose the loan was collateralized by C-Quadrant's property and Gregory's use of the loan proceeds to make payments to investors in another entity.

132.  Actual and prospective investors would have considered it important in making their decision to invest in C-Quadrant whether its property was encumbered by substantial debt, and that the loan proceeds had not been used to develop C-Quadrant's business, but rather used to pay off investors in an entirely unrelated

entity.

### e) The Johnsons' and Gregory's Additional Misrepresentations and Deceitful Conduct

133. ***C-Quadrant's Purported Relationship with a Prominent California University.*** In connection with the C-Quadrant and GPA offerings, during one or more investor tours of the Salinas marijuana farm and/or C-Quadrant's extraction facility, Todd Johnson and Gregory falsely represented that a prominent California university would be renting space at C-Quadrant's extraction facility to conduct cannabis research, lending an air of credibility to the venture.

134. Similar misrepresentations regarding C-Quadrant's purported affiliation with the California university were made in a recorded presentation by Todd Johnson, on GBI Marketing's website and in emails to prospective investors.

135. Todd Johnson stated in a recorded audio PowerPoint presentation sent to prospective C-Quadrant and GPA investors, "Good news. This is interesting, and this – it's not actually going to make us money, but I believe it kind of tells about – it tells the world kind of who we are. We have a group of [California university] medical scientists and doctors that are going to be renting on their own dime a portion of the space in our facility to develop a case study and ultimately medicines for healing humans. They want to be near our technology. They need our technology to get the job done at the level that they need to get it done at. And they would like to share brain science with us and kind of collaborate on some of the findings."

136. In reality, and as the Johnsons and Gregory knew, or were reckless or negligent in not knowing, that C-Quadrant had no business or research relationship with the California university.

137. Investors and prospective investors would have considered it important in making their decision to invest in C-Quadrant whether the statements made about its affiliation with the California university were correct, both in assessing the honesty and veracity of the Johnsons and Gregory, and the legitimacy of C-Quadrant

and its prospects for generating a return on their investments.

138.   ***Gregory's Background.***  During one or more tours of the Salinas marijuana farm and/or C-Quadrant's extraction facility, Todd Johnson told prospective investors, in Gregory's presence, that Gregory had an MBA.

139.   Gregory failed to correct Todd Johnson's statement.

140.   In fact, Gregory did not have an MBA, as Todd Johnson and Gregory knew, or were reckless or negligent in not knowing.

141.   Actual and prospective investors would have considered it important in making their decision to invest in C-Quadrant whether or not Gregory had a MBA, both in assessing the honesty and veracity of the Johnsons and Gregory, and in assessing Gregory's competency to perform as C-Quadrant's CEO.

142.   ***Alleged Capital Contribution***.  C-Quadrant's original operating agreement, which Gregory wrote, and was sent to investors and prospective investors, represented that Gregory had made a $500,000 capital contribution to the company.

143.   As Gregory knew, or was reckless or negligent in not knowing, that representation was false as he had not made a $500,000 capital contribution to C-Quadrant.

144.   Actual and prospective investors would have considered it important in making their decision to invest in C-Quadrant whether or not Gregory had made a large capital contribution to C-Quadrant, both in assessing the honesty and veracity of Gregory, and in assessing Gregory's confidence in C-Quadrant's future success and its prospects for generating a return on their investment.

**B.     Richard Portillo and His RJ Holdings Offering**

**1.     Portillo's background as an unregistered broker for the Johnsons' fraudulent offerings**

145.   From at least September 2017 to June 2018, Portillo worked for the Johnsons as a commissioned sales agent in connection with the Smart Initiatives, Valley View, and Target Equity offerings related to the Salinas marijuana farm.

146.   In or about February 2018, Portillo created defendant CIS Marketing, also known as the "Cannabis Investment Spot," or "Cannabis Investing Spot" to solicit prospective investors to invest in the Johnsons' Target Equity offering and to promote his own unregistered securities offering in the name of RJ Holdings.

147.   Portillo and CIS Marketing solicited prospective investors to invest in the Johnsons' offerings and his RJ Holdings offering using CIS Marketing's website, Facebook, Craigslist ads, and LinkedIn and by cold-calling telephone numbers from purchased lead lists.

148.   Portillo conducted presentations at the Salinas marijuana farm for prospective investors.

149.   At all relevant times, Portillo controlled CIS Marketing and supervised its operations.

150.   Portillo, both directly and through CIS Marketing, received transaction-based compensation, in the form of a ten percent commission (five percent cash and five percent equity) on the Smart Initiatives, Valley View and Target Equity securities he and CIS Marketing sold for the Johnsons' issuers.

151.   Portillo also employed and supervised a sales team at CIS Marketing that actively reached out to prospective investors to invest in the RJ Holdings offering.

### 2.     Portillo's Unregistered and Fraudulent Offering: RJ Holdings

152.   When C-Quadrant began its first offering in approximately January 2018, Todd Johnson told Portillo that the Johnsons would no longer pay him commissions and suggested that Portillo form his own entity to raise money from investors.

153.   Following Todd Johnson's recommendation, in or about January 2018, Portillo formed RJ Holdings to serve as a fundraising vehicle for C-Quadrant; it had no business purpose other than to invest in and own a portion of C-Quadrant.

154.   Between January 2018 and February 2019, Portillo, through his RJ

Holdings offering, with a maximum offering amount of $15 million, raised approximately $2.8 million from approximately 52 investors located in multiple states.

155.   Portillo, exercised day-to-day control over RJ Holdings and, directly and indirectly, controlled and conducted the unregistered securities offering of RJ Holdings.

156.   The RJ Holdings' unregistered offering constituted an offer and sale of securities, in the form of investment contracts, in that it involved the offer to purchase fractional interests or "membership units" in the issuer that involved: (a) an investment of money; (b) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.

157.   The private placement memorandum for RJ Holdings, dated January 8, 2018, stated that the company's business would be substantially dependent on C-Quadrant's management team.

158.    With respect to the RJ Holdings' unregistered securities offering, investor funds were pooled, and the investors' expectation of profits were interwoven with and dependent upon the success of the managers of C-Quadrant's extraction facility.

159.   The private placement memoranda for RJ Holdings referred to the memberships units as "securities."

160.   Portillo and CIS Marketing solicited prospective investors to invest in RJ Holdings using CIS Marketing's website, Facebook, Craigslist ads, and by cold calling telephone numbers from purchased lead lists.

161.   Portillo personally communicated with prospective investors via phone and email and conducted tours of C-Quadrant's extraction facility.

162.   Portillo also employed and supervised a sales team at CIS Marketing that actively reached out to prospective investors to invest in RJ Holdings.

163.   At least 11 non-accredited investors purchased RJ Holdings' securities.

164. None of the investors RJ Holdings were furnished with audited balance sheets of the issuer.

165. Portillo did not take any steps to verify investors' accreditation status.

166. Portillo reviewed and approved RJ Holdings' private placement memorandum.

167. RJ Holdings' private placement memorandum stated that the managers or RJ Holdings (*i.e.*, Portillo and his co-manager) would not receive a salary or otherwise be compensated, other than solely through their ownership of RJ Holdings, which, in turn, would own a portion of C-Quadrant.

168. In other words, RJ Holdings' private placement memorandum represented to investors that its managers would profit only if C-Quadrant were profitable.

169. Portillo and his co-manager transferred over $200,000 in investor funds to CIS Marketing, an entity that Portillo owned and controlled.

### 3. Portillo Misled and Deceived Investors In Connection With RJ Holdings' Offering

170. In connection with the RJ Holdings' offering, Portillo deceived investors and made material misrepresentations and omissions to investors about expected returns, his reputation and criminal background, and his purported capital contributions.

#### a) Returns on Investment

171. Portillo, RJ Holdings and CIS Marketing falsely stated that RJ Holdings' investors were guaranteed a 100 percent annual return and that existing investors were already receiving such returns.

172. For example, Portillo prepared and used a script for the RJ Holdings offering that falsely claimed "Our investors are yielding a tremendous 100% return on investment in the first 12 months."

173. Also, Portillo sent a February 2018 email to a prospective investor

stating "This is a solid investment with high returns at 100%" and "We are raising $15M and offering 100% ROI to our investors."

174.   As Portillo knew, or was reckless or negligent in not knowing, C-Quadrant was a startup company, had no history of operations, and had not made any distributions to investors.

175.   To the extent his RJ Holdings' script referred to the purported record of past success of the prior investments in the Salinas marijuana farm as a basis to recommend investments in C-Quadrant's extraction facility, Portillo knew, or was reckless or negligent in not knowing, as an equity holder in Smart Initiatives, Valley View and Target Equity, that those investments were not yielding 100% returns on an annual basis because the farm had made no distributions prior to April 2018, and those it did make in or about May and July 2018 were negligible.

176.   Portillo's CIS Marketing website also included additional material misrepresentations concerning RJ Holdings, such as: "We are regulated by the SEC and have rewarded hundreds of California investors with reliable, high-profit returns on their Cannabis investments."

177.   As Portillo knew, or was reckless or negligent in not knowing, neither C-Quadrant, nor any of the aforementioned issuers invested in the Salinas marijuana farm, had been rewarded with reliable, high-profit returns on their cannabis investments.

178.   Portillo also knew, or was reckless or negligent in not knowing, that the RJ Holdings offering had not been registered with, or approved by the Commission.

179.   Actual and prospective investors would have considered it important in making their decision to invest in RJ Holdings whether investors were guaranteed 100 percent annual returns, whether existing investors were already receiving such returns, and whether the offering was registered with or approved by the Commission.

### b)    Portillo's Criminal Record

180.   RJ Holdings' private placement memorandum touted Portillo's reputation and expertise in the cannabis industry and described "his company [CIS Marketing]" as "the preferred supplier of accredited cannabis investments across the nation and around the world."

181.    The wholly positive summary of Portillo's background in the RJ Holdings' private placement memorandum was materially misleading in light of Portillo's extensive criminal record.

182.   In June 2018, Portillo was convicted of felony domestic violence and witness intimidation.

183.   Portillo had at least two prior convictions for domestic violence, and was on probation and subject to a restraining order at the time of the 2018 assault.

184.   Portillo also has prior convictions for felony possession of marijuana for sale, felony taking of a vehicle, and felony assault with a deadly weapon.

185.   Portillo knowingly, recklessly and/or negligently failed to disclose his criminal history to investors or prospective investors in RJ Holdings.

186.   Actual and prospective investors would have considered it important in making their decision to invest in RJ Holdings whether or not Portillo was a convicted felon with a history of domestic violence and other crimes.

187.   Furthermore, Portillo concealed the extent of his criminal history during his investigative testimony before the Commission staff, where he omitted recent domestic violence convictions from his background questionnaire and falsely testified that his background questionnaire was complete and accurate.

188.   On information and belief, Portillo failed to fully disclose his criminal history to the SEC as he understood that it was material information that he had failed to disclose to investors.

///

///

### c)     Portillo's Purported Capital Contribution to RJ Holdings

189.   RJ Holdings' operating agreement, which Portillo signed and which was provided to investors and prospective investors, stated that he and his co-manager had each contributed $25,000 in capital to RJ Holdings.

190.   As Portillo knew, or was reckless or negligent in not knowing, that statement was false, as neither he nor his co-manager had made a $25,000 capital contribution to RJ Holdings.

191.   Actual and prospective investors would have considered it important in making their decision to invest in RJ Holdings whether or Portillo and/or RJ Holdings' co-manager had made a capital contribution to RJ Holdings, both in assessing the honesty and veracity of Portillo, and in assessing the likelihood of RJ Holdings' financial success.

### C.     Lloyd, Heckele, and Their ECT1 and GGV Offerings

#### 1.     Lloyd's background as an unregistered broker for the Johnsons' fraudulent offerings

192.   From at least November 2017 to January 2018, Lloyd worked as a sales agent for the Johnsons, soliciting investors for the Valley View, Target Equity, and GPA offerings.

193.   He and/or his marketing entity, Lloyd Marketing, received transaction-based compensation, in the form of commissions, from the Johnsons' entities on the sale of Valley View, Target Equity, and GPA securities.

194.   Near the end of the Valley View offering, Todd Johnson suggested that Lloyd form his own entity to raise money from investors.

#### 2.     The ECT1 and GGV Offerings

195.   Between January and September 2018, Lloyd and Mark Heckele conducted at least two unregistered securities offerings: (1) ECT1, which had a

COMPLAINT                                      27

maximum offering amount of $5 million, which raised approximately $2.9 million from  approximately 61 investors located in multiple states, for the stated purpose of investing in C-Quadrant; and (2) GGV, which had a maximum offering amount of $4.5 million, and raised approximately $755,000 from approximately 16 investors located in multiple states, for the stated purpose of investing in Target Equity, which, in turn, was invested in the Salinas marijuana farm.

196.   Lloyd and Heckele, as the managing members of ECT1 and GGV, exercised day-to-day control over those entities, and directly and indirectly, controlled and conducted the unregistered securities offerings of ECT1 and GTV.

197.   Each of those unregistered offerings constituted an offer and sale of securities, in the form of investment contracts, in that they each involved the offer to purchase fractional interests or "membership units" in the issuer that involved: (a) an investment of money; (b) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.

198.   The private placement memoranda for ECT1 and GGV, dated January 2018, and March 2018, respectively, stated that the company's business would be substantially dependent on C-Quadrant's management team and the Salinas marijuana farm's management team, respectively.

199.   In addition, with respect to each of the unregistered securities offerings, investor funds were pooled, and the investors' expectation of profits were interwoven with and dependent upon the success of the managers of the Salinas marijuana farm and C-Quadrant's extraction facility.

200.   Each of the private placement memoranda for the ECT1 and GGV referred to the memberships units as "securities."

201.   Lloyd used his entity, Lloyd Marketing, to solicit investor interest in ECT1 and GGV, and supervised and controlled its sales staff.

202.   At least 34 non-accredited investors invested in the ECT1 offering.

203.   At least one or more non-accredited investors invested in the GGV

offering.

204.   Lloyd and Heckele did not make any effort to verify investors' accreditation status.

205.   None of the investors ECT1 or GGV were furnished with audited balance sheets of the issuer.

206.   Heckele prepared the ECT1 and GGV private placement memoranda, and he and Lloyd shared final authority over the contents of each of them.

207.   Lloyd solicited investors for both offerings via Craigslist, Facebook, and Instagram, among other things, and he trained and oversaw other salespeople.

208.   Both Lloyd and Heckele communicated with prospective investors, touted the merits of the investments, and they each received transaction-based compensation in the form of a management fee of 15 percent that was tied directly to the amount of investor funds raised through the ECT1 and GGV offerings.

### 3.   Heckele and Lloyd Misled and Deceived Investors

209.   Heckele, Lloyd, ECT1, and GGV, deceived investors and knowingly, recklessly and/or negligently made material misrepresentations to investors regarding expected returns on their investments.

210.   Lloyd used language in Craigslist ads and emails with prospective investors suggesting that ECT1 and GGV investors were guaranteed a return of 100 percent or more annually.

211.   For example, Lloyd prepared a script to solicit investors in ECT1, which he sent to Heckele and various sales agents on January 19, 2018.  The script said the following regarding the Salinas marijuana farm: "Those investors are making great returns – some at 200% annual returns, 150%, 100%, etc."  The same script said, "100% annual returns are a like a worst case scenario."

212.   The script also touted Heckele's role in the offering: "The other managing partner is an attorney, Mark Heckle, and he drafted the PPM document you

have that says 100% annual returns.  So, like I said, 100% returns is a joke – it's a major understatement of reality."

213.   In an email dated March 20, 2018, that Lloyd sent to a prospective GGV investor, Lloyd stated: "Currently, we are offering investors a 132% annual return on their partner shares based on the pro forma (projection) for an existing, cash flowing farm."

214.   In another email, also dated March 20, 2018, that Lloyd sent to a prospective GGV investor, Lloyd stated, "Currently, we are offering investors a 183% annual return on their partner shares based on the pro forma for an existing, cash flowing farm."

215.   In reality, as Lloyd knew, or was reckless or negligent in not knowing, particularly in light of his ownership of equity in Valley View and/or Target Equity, existing investors had not received any distributions as of March 2018, and that investors were not making 100% annual returns, or anywhere close to that amount.

216.   Actual and prospective investors would have considered it important in making their decision to invest in ECT1 and GGV whether investors were guaranteed 100 percent annual returns and whether existing investors were already receiving such returns.

217.   Heckele knew, or was reckless or negligent in not knowing that he and Lloyd, both individually and through ECT1 and GGV, were making materially misleading statements to investors about returns on investment.

218.   The GGV private placement memorandum, which Heckele prepared, contained a "5-year Projection on ROI" chart, including 2018 net income of $37 million for the Salinas marijuana farm and a 132.98% annual return for GGV investors.

219.   The GGV private placement memorandum represented that "[t]hese figures are based on [the Salinas marijuana farm's] *pro forma*," but it failed to disclose that the pro forma's 2018 net income projections actually ranged from $23 to

$37 million.

220.  Heckele also prepared the ECT1 private placement memorandum, which included a projected five-year return of averaging 100% per year.

221.  Heckele had no experience in the cannabis industry, did not know who prepared the Salinas marijuana farm's pro forma numbers, and did virtually nothing to investigate the farm's past performance or whether its projections had any reasonable basis in fact.

222.  In addition, GGV's private placement memorandum was materially misleading as it selectively presented a projected return on investment that was based only the high end of the pro forma's projected range.

223.  Lloyd and Heckele touted this misleading pro forma figure in communications with prospective investors.

224.  For example, in an email to a prospective investor dated April 4, 2018, Heckele wrote that GGV's "prospective annual ROI" was "a (measly) 133%."

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against all Defendants except Lloyd Marketing)

### (Section 17(a)(1) and (3) only against Gregory)

225.  The SEC re-alleges and incorporates by reference paragraphs 1 through 224 above.

226.  In connection with the Smart Initiatives, Valley View, Target Equity, and ZFG offerings, those four defendant entities and the Johnsons misled and deceived investors and prospective investors about the use of investor funds, the Johnson's compensation, expected returns on investment, and Jeremy Johnson's bankruptcy.  In addition, GBI Marketing misled and deceived investors in those four offerings about returns on investment.

227.  In connection with the GPA offering, the defendant entity and the

Johnsons misled and deceived investors and prospective investors about returns on investment, the use of investor funds, the Johnsons' compensation, Jeremy Johnson's bankruptcy, C-Quadrant's purported business loan and its purported relationship with the prominent California university.

228.   In connection with the C-Quadrant offering, the defendant entity and the Johnsons misled and deceived investors about returns on investment, Jeremy Johnson's bankruptcy, the nature and purpose of C-Quadrant's "business loan," and C-Quadrant's "relationship" with a prominent California university.

229.   In connection with the GPA and C-Quadrant offerings, GBI Marketing misled and deceived investors about returns on investment and C-Quadrant's relationship with the California university.

230.   In connection with the C-Quadrant offering, the defendant entity and Gregory misled and deceived investors about C-Quadrant's "business loan," its "relationship" with a prominent California university and his purported capital contribution.

231.   Todd Johnson and Gregory also misled and deceived investors about Gregory's purported MBA.

232.   In connection with the RJ Holdings offering, the defendant entity and Portillo, misled and deceived RJ Holdings' investors about returns on investment, Portillo's criminal background, and Portillo and his co-manager's capital contributions.

233.   In connection with the RJ Holdings offering, CIS Marketing misled and deceived investors about returns on investment.

234.   In connection with the ECT1 and GGV offerings, the defendant entities and Lloyd and Heckele misled and deceived investors about returns on investment.

235.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use

of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

236.   Defendants, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

237.   The defendant entities acted entirely through their principals' knowledge, recklessness and/or negligence which may be imputed to the defendant entities.

238.   By engaging in the conduct described above, Defendants (with the exception of Lloyd Marketing and Gregory) violated, and unless restrained and enjoined will continue to violate, Sections 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a).

239.   By engaging in the conduct described above Gregory violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & (3).

## <u>SECOND CLAIM FOR RELIEF</u>

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants except Lloyd Marketing)**

240.   The SEC re-alleges and incorporates by reference paragraphs 1 through

COMPLAINT                                                                                    33

224 above.

241.   In connection with the Smart Initiatives, Valley View, Target Equity, and ZFG offerings, those four defendant entities and the Johnsons misled and deceived investors and prospective investors about the use of investor funds, the Johnson's compensation, expected returns on investment, and Jeremy Johnson's bankruptcy.  In addition, GBI Marketing misled investors in those four offerings about returns on investment.

242.   In connection with the GPA offering, the defendant entity and the Johnsons misled and deceived investors and prospective investors about returns on investment, the use of investor funds, the Johnsons' compensation, Jeremy Johnson's bankruptcy, C-Quadrant's purported business loan and its purported relationship with a prominent California university.

243.   In connection with the C-Quadrant offering, the defendant entity and the Johnsons misled and deceived investors about returns on investment, Jeremy Johnson's bankruptcy, the nature and purpose of C-Quadrant's "business loan," and C-Quadrant's "relationship" with a prominent California university.

244.    In connection with the GPA and C-Quadrant offerings, GBI Marketing misled and deceived investors about returns on investment and C-Quadrant's relationship with a California university.

245.   In connection with the C-Quadrant offering, the defendant entity and Gregory misled and deceived investors about C-Quadrant's "business loan," its "relationship" with a prominent California university and his purported capital contribution.

246.    Todd Johnson and Gregory also misled and deceived investors about Gregory's purported MBA.

247.   In connection with the RJ Holdings offering, the defendant entity and Portillo, misled and deceived RJ Holdings investors about returns on investment, Portillo's criminal background, and Portillo and his co-manager's capital

contributions.

248.   In connection with the RJ Holdings offering, CIS Marketing misled and deceived investors about returns on investment.

249.   In connection with the ECT1 and GGV offerings, the defendant entities and Lloyd and Heckele misled and deceived investors about returns on investment.

250.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

251.   In engaging in the conduct described above, Defendants acted knowingly or recklessly.

252.   The defendant entities acted knowingly or recklessly in engaging in this conduct because they acted entirely through their principals, whose knowledge and recklessness may be imputed to the defendant entities.

253.   By engaging in the conduct described above, Defendants (with the exception of Lloyd Marketing) violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a)-(c) thereunder, 17 C.F.R. §§ 240.10b-5(a)-(c).

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against all Defendants)**

254.   The SEC re-alleges and incorporates by reference paragraphs 1 through

COMPLAINT                                                                35

224 above.

255.   Each of the offerings by Smart Initiatives, Valley View, Target Equity, ZFG, C-Quadrant, GPA, RJ Holdings, ECT1 and GGV involved the offering of securities in the form of investment contracts.

256.   None of those offerings were registered with the Commission,

257.   The Johnsons, Gregory, Portillo, Lloyd and Heckele directly and indirectly participated in the offer and sale of the unregistered securities of their respective entities, and were necessary participants and substantial factors in those sales because among other things, they were the managing members of the issuer entities, they prepared, reviewed, approved and authorized the issuers' private placement memoranda, and oversaw and orchestrated their respective offerings.

258.   In addition, the Johnsons, Portillo, Lloyd, Heckele, and the defendant marketing entities– GBI Marketing, CIS Marketing and Lloyd Marketing – directly and indirectly offered and sold the issuers' securities by, among other things, soliciting investors through phone calls, emails, online advertising, in person presentations, and through GBI Marketing's, CIS Marketing's and Lloyd Marketing's websites.

259.   By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities.

260.   By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 5 of the Securities Act, 15 U.S.C § 77e.

## FOURTH  CLAIM FOR RELIEF

### Unregistered Broker-Dealer

### Violation of Section 15(a) of the Exchange Act

### (against Defendants Todd and Jeremy Johnson, Portillo, Lloyd, Heckele, GBI Marketing, CIS Marketing, and Lloyd Marketing)

261.   The SEC re-alleges and incorporates by reference paragraphs 1 through 224 above.

262.   As alleged above, the Johnsons, Portillo, Lloyd, Heckele, GBI Marketing, CIS Marketing, and Lloyd Marketing acted as unregistered broker-dealers because they each actively solicited investors both directly and indirectly, made recommendations and other representations, both orally and in writing, about the merits of investing in the defendant issuer entities, and received transaction-based compensation.

263.   By engaging in the conduct described above, the Johnsons, Portillo, Lloyd, Heckele, GBI Marketing, CIS Marketing, and Lloyd Marketing, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

264.   By engaging in the conduct described above, the Johnsons, Portillo, Lloyd, Heckele, GBI Marketing, CIS Marketing, and Lloyd Marketing have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## FIFTH CLAIM FOR RELIEF

### Control Person Liability

### Section 20(a) of the Exchange Act

### (against Defendants Todd and Jeremy Johnson, Gregory, Portillo, Lloyd and Heckele)

265.   The SEC re-alleges and incorporates by reference paragraphs 1 through 224 above.

266.   Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], any person who, directly or indirectly controls an entity that is liable under any provision of the Exchange Act or any rule or regulation thereunder, shall also be jointly and severally liable with and to the same extent as that entity, unless the controlling person can establish that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

267.   As alleged above, Smart Initiatives, Valley View, Target Equity, ZFG, GPA, and C-Quadrant violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, GBI Marketing violated Section 10(b) and 15(a) of the Exchange Act and Rule 10b-5 thereunder, and Lloyd Marketing violated Section 15(a) of the Exchange Act.

268.   Todd and Jeremy Johnson, as the managing members of Smart Initiatives, Valley View, Target Equity, ZFG, GPA, and GBI Marketing, directly and indirectly controlled those entities and exercised day-to-day control over each of them, including by orchestrating and overseeing the offerings of the issuer entities, preparing, authorizing and disseminating the issuers' private placement memoranda, and directing and supervising their fund raising activities.  By reason of the foregoing, Todd and Jeremy Johnson are liable as control persons for the entities' violations of the Exchange Act and the rules and regulations thereunder.

269.   The Johnsons and Gregory, as the managing members of C-Quadrant, directly and indirectly controlled that entity, and exercised day-to-day control over that entity, including by orchestrating and overseeing C-Quadrant's offering, preparing, authorizing and disseminating its  private placement memoranda, and directing and supervising its fund raising activities.  By reason of the foregoing, the Johnsons and Gregory are liable as control persons for C-Quadrant's violations of the Exchange Act and the rules and regulations thereunder.

270.   Portillo, as the managing member of RJ Holdings and CIS Marketing, directly and indirectly controlled those entities, and exercised day-to-day control over those entities, including by orchestrating and overseeing RJ Holdings' offering, preparing, authorizing and disseminating its private placement memorandum, and directing and supervising RJ Holdings' and CIS Marketing's fund raising activities. By reason of the foregoing, Portillo is liable as a control person for the entities' violations of the Exchange Act and the rules and regulations thereunder.

271.   Lloyd and Heckele, as the managing members of GGV and ECT1, directly and indirectly controlled those entities, and exercised day-to-day control over those entities, including by orchestrating and overseeing their offerings, preparing, authorizing and disseminating their private placement memoranda, and directing and supervising their fund raising activities.   By reason of the foregoing, Lloyd and Heckele are as  control persons for the entities' violations of the Exchange Act and the rules and regulations thereunder

272.   Lloyd, as the managing member of Lloyd Marketing, directly and indirectly controlled that entity, and exercised day-to-day control over that entity, including by directing and supervising its fund raising activities.  By reason of the foregoing, Lloyd is liable for Lloyd Marketing's violation of the Exchange Act and the rules and regulations thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Todd Johnson, Jeremy Johnson, Gregory, Portillo, Heckele, Lloyd, Smart Initiatives, Valley View, Target Equity, ZFG, C-

Quadrant, GPA, GBI Marketing, RJ Holdings, CIS Marketing, ECT1, and GGV, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Todd Johnson, Jeremy Johnson, Portillo, Heckele, Lloyd, GBI Marketing, CIS Marketing, and Lloyd Marketing and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Todd Johnson, Jeremy Johnson, Gregory, Portillo, Heckele, Lloyd, Smart Initiatives, Valley View, Target Equity, ZFG, C-Quadrant, GPA, GBI Marketing, RJ Holdings, CIS Marketing, ECT1, GGV, and Lloyd Marketing, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### V.

Order Defendants Todd Johnson, Jeremy Johnson, and GBI Marketing, jointly and severally; Portillo and CIS Marketing, jointly and severally; and Lloyd and Lloyd Marketing, jointly and severally, and Heckele to disgorge, all funds received from their illegal conduct, together with prejudgment interest thereon.

## VI.

Order Defendants Todd Johnson, Jeremy Johnson, Portillo, Lloyd, Heckele and Gregory to pay civil penalties Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: July 28, 2020

/s/ Donald W. Searles
DONALD W. SEARLES
Attorney for Plaintiff
Securities and Exchange Commission