1  DONALD W. SEARLES (Cal. Bar No. 135705)
   Email: searlesd@sec.gov
2  CHARLES E. CANTER (Cal. Bar No. 263197)
   Email: canterc@sec.gov
3  COLLEEN M. KEATING (Cal. Bar No. 261213)
   Email: keatingc@sec.gov
4
   Attorneys for Plaintiff
5  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
6  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
7  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
8  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12

13  | SECURITIES AND EXCHANGE | Case No.  5:20-cv-01493-MCS-SHK |
14  | COMMISSION, | |

    **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

15              Plaintiff,

16        vs.                        Final Pretrial
                                     Conference:    March 7, 2022
17  ANTHONY TODD JOHNSON, et al,
                                     Trial:         March 22 , 2022
18              Defendants.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   PROCEDURAL HISTORY ....................................................................1

III.  PLAINTIFF'S CLAIMS........................................................................2

    A.    Summary Statement of Each Claim ...............................................2

    B.    Elements Required to Establish Each Claim...................................4

        1.    First Claim – Section 17(a) of the Securities Act ......................4

        2.    Second Claim – Section 10(b) of the Exchange Act ................4

        3.    Claim Five – Section 20(a) of the Exchange Act .....................5

    C.    Brief Description of Key Evidence in Support of Each Claim...........6

        1.    Section 17(a) of the Securities Act ............................................6

        2.    Section 10(b) of the Exchange Act ............................................8

        3.    Section 20(a) of the Exchange Act ............................................9

    D.    Summary Statement of Defendant's Affirmative Defense .................9

    E.    Elements Required to Establish Defendant's Affirmative Defense of Good Faith........................................................................................9

    F.    Brief Description of Key Evidence in Opposition to Defendant's Affirmative Defense .......................................................................10

        1.    Heckele directly or indirectly induced the violation................10

        2.    Heckele did not act in good faith. ...........................................10

    G.    Remedies ........................................................................................10

        1.    Permanent Injunctions .............................................................10

        2.    Disgorgement with Prejudgment Interest ................................11

        3.    Civil Penalty............................................................................13

    H.    Anticipated Evidentiary Issues .....................................................14

    I.    Anticipated Issues of Law .............................................................14

    J.    Bifurcated Issues ...........................................................................14

    K.    Jury Trial .......................................................................................14

    L.    Attorney's Fees..............................................................................14

M.      Abandonment of Issues .........................................................................14

# TABLE OF AUTHORITIES

## CASES

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983)................................................................5

*Hollinger v. Titan Capital Corp.,*
   914 F.2d 1564 (9th Cir. 1990)...........................................5, 9

*Howard v. Everex Systems, Inc.,*
   228 F.3d 1057 (9th Cir. 2011).............................................5

*Liu v. SEC,*
   140 S. Ct. 1936 (2020)....................................................11, 12

*SEC v. Burns,*
   816 F.2d 471 (9th Cir. 1987)...............................................5

*SEC v. Cross Fin. Services,*
   908 F. Supp. 718 (C.D. Cal. Sept. 5, 1995)........................12

*SEC v. Dain Rauscher, Inc.,*
   254 F.3d 852 (9th Cir. 2001)...............................................4

*SEC v. Koracorp Indus., Inc.,*
   575 F.2d 692 (9th Cir. 1978)..............................................10

*SEC v. Liu,*
   No. SACV-16-00974-CJC, 2021 WL 2374248 (C.D. Cal. June 7, 2021).........12

*SEC v. Lyndon,*
   39 F. Supp. 3d 1113 (D. Haw. 2014).................................13

*SEC v. Manor Nursing Centers, Inc.,*
   458 F.2d 1082 (2d Cir. 1972).............................................12

*SEC v. Platforms Wireless Int'l. Corp.,*
   559 F. Supp. 2d 1091 (S.D. Cal. 2008) ............................3, 5

*SEC v. Platforms Wireless Int'l Corp.,*
   617 F.3d 1072 (9th Cir. 2010).............................3, 4, 5, 11, 12

*SEC v. Todd,*
   642 F.3d 1207 (9th Cir. 2011)...............................................5

*Webb v. SolarCity Corp.,*
   884 F.3d 844 (9th Cir. 2018)................................................4

## FEDERAL STATUTES

## Securities Act of 1933

Section 17(a)
   [15 U.S.C. § 77q(a)] ..............................................1, 2, 3, 5, 8

Section 20(b)
    [15 U.S.C. § 77t(b)] ...................................................................................10

Section 20(d)(2)(C)
    [15 U.S.C. §77t(d)(2)(C)] ......................................................................2, 13

Section 5
    [15 U.S.C. § 77e] ...............................................................1, 2, 3, 11, 13

**Securities Exchange of 1934**

Section 10(b)
    [15 U.S.C. § 78j(b)] ....................................................1, 2, 3, 4, 8, 9

Section 15(a)
    [15 U.S.C. § 78o(a)] .............................................2, 3, 11, 12, 13

Section 20(a)
    [15 U.S.C. § 78t(a)] ......................................................2, 3, 5, 9

Section 21(d)
    [15 U.S.C. § 78u(d)] ...............................................................10, 11

Section 21(d)(3)(B)(iii)
    [15 U.S.C. §78u(d)(3)(B)(iii)] .......................................................13

Section 21(d)(5)
    [15 U.S.C. § 78u(d)(5)] .................................................................11

Section 21(d)(7)
    [15 U.S.C.§ 78u(d)(7)] .........................................................11, 12


**FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5]...............................................1, 3, 4, 9

Rule 405
    [17 C.F.R. § 230.405] ....................................................................5

**FEDERAL RULES OF CIVIL PROCEDURE**

Federal Rule of Civil Procedure 38(b)........................................................14

**LOCAL RULES**

Local Rule 16-4.........................................................................................1

**COMMISSION RELEASES**

*Adjustments to Civ. Monetary Penalty Amounts*,
    Release No. 5664 (Jan. 8, 2021) ......................................................13

## **OTHER AUTHORITIES**

Ninth Circuit Manual of Model Civil Jury Instructions § 18.11 (2017) .......................9

## I.   __INTRODUCTION__

Pursuant to Local Rule 16-4, Plaintiff Securities and Exchange Commission ("SEC") hereby submits this Memorandum of Contentions of Fact and Law.

## II.   __PROCEDURAL HISTORY__

The SEC's complaint (ECF. No. 1), filed on July 28, 2020, alleges that between September 2017 and February 2019, nine issuer entities and their respective principals and control persons raised over $25 million from more than 400 investors located in multiple states in a series of unregistered securities offerings to finance two marijuana business.  Five of the issuer defendants—Smart Initiatives, LLC, Valley View Enterprises LLC, Target Equity LLC, Zabala Farms Group, LLC, and Green Growth Ventures, LLC ("GGV")—raised approximately $12.3 million from approximately 226 investors for the stated purpose of investing in a newly established and licensed marijuana farm located in Salinas, California. The other four issuer defendants—C Quadrant LLC, GPA Enterprises LLC, RJ Holdings Group, LLC, and Extraction Capital Tier 1, LLC ("ECT1")—raised approximately $13.2 million from approximately 211 investors for the stated purpose of developing C-Quadrant, a startup cannabidiol ("CBD") extraction facility, also located Salinas, California.

In soliciting investor funds to invest in the marijuana farm and the CBD extraction facility, defendants Todd and Jeremy Johnson, who were the principals and control persons of six of the issuers, and defendants Richard Portillo, Charles Lloyd, and Mark Heckele, who were the principals and control persons of the other three issuers, misled and deceived actual and prospective investors, in a number of ways, including about the profits they could expect to realize on their investments, claiming that the investments would generate annual returns of 100% or more.  *See generally* ECF No. 1. The SEC has alleged violations of the registration provisions of Section 5 of the Securities Act of 1933 (the "Securities Act"), the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and/or the broker

registration provisions of Section 15(a) of Exchange Act.

To date, all defendants except Heckele have consented to final judgment. On January 26, 2022, the Court entered an order granting in part and denying in part the SEC's motion for summary judgment against Heckele. ECF No. 83. The Court determined that Heckele violated Section 5 of the Securities Act and Section 15(a) of the Exchange Act. In addition, the Court determined that all elements of the antifraud claims were established for purposes of trial except negligence for the Section 17(a)(2) and (3) claim, and scienter for the Section 17(a)(1) and Section 10(b) claim. Finally, the Court determined that Heckele was a control person for purposes of Section 20(a) of the Exchange Act, but the Court did not determine whether the issuers ECT1 and GGV had violated the Exchange Act or address Heckele's affirmative defense to control person liability.

The SEC seeks entry of permanent injunctions against Heckele from committing future violations of the above statutory and regulatory provisions. The SEC also seeks an order requiring the disgorgement of all ill-gotten gains, together with prejudgment interest thereon, and assessment of civil penalties. *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 78u(d)(5) & (d)(7).

## III.   PLAINTIFF'S CLAIMS

### A.   Summary Statement of Each Claim

1.   **First Claim for Relief** – The SEC's first claim alleges violations of Section 17(a) of the Securities Act against Heckele based on material misstatements and omissions regarding the operations and expected profitability of the extraction facility and farm, including by:

(a)   touting returns of more than 100 percent per year on the first page of the private placement memoranda ("PPMs") for each offering;

(b)   touting returns of more than 100 percent per year in emails and phone calls to investors;

(c)   implying that the projected returns were the minimum returns

investors could expect;

       (d)    failing to disclose that the C Quadrant facility had no operations, no title to land where it would be located, no supply contracts, no distribution contracts, and no completed environmental study required by applicable laws; and

       (e)    failing to disclose that Lloyd had not received anything like the promised returns from his own equity interest in the marijuana farm.

The Complaint alleges that Heckele obtained money or property by means of these material misstatements and omissions and that Heckele acted at least negligently.

    2.    **Second Claim for Relief** – The SEC's second claim alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Heckele by the same material misstatements and omissions that give rise to the Section 17(a) violations. The Complaint alleges that Heckele acted with scienter in that he knew or was reckless in not knowing that the statements and omissions were false or misleading.

    3.    **Fifth Claim for Relief**[1] – The SEC's fifth claim alleges that Heckele is liable as a control person for the violations of Section 10(b) and Rule 10b-5 by the issuers ECT1 and GGV. Specifically, Lloyd acted at least recklessly in making material misstatements to investors implying the projected returns were guaranteed, and Lloyd's scienter can be imputed to those entities. *See, e.g., SEC v. Platforms Wireless Int'l. Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008), *aff'd.*, 617 F.3d 1072 (9th Cir. 2010)). Because Heckele, as manager of the entities, exercised day-to-day control over the entities and the offerings, he is liability under Section 20(a) of the Exchange Act.

---

[1] As noted, the Court has granted summary judgment on the SEC's Third (Section 5) and Fourth (Section 15(a)) Claims for Relief.

**B.  Elements Required to Establish Each Claim**

    **1.  First Claim – Section 17(a) of the Securities Act**

To prove a Section 17(a)(2) violation, the SEC must demonstrate by a preponderance of the evidence that the defendant:

    (1) by means of interstate commerce;

    (2) obtained money or property;

    (3) by means of a material false statement or omission; and

    (4) acted at least negligently.

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001). A person acts "negligently" when he or she fails to act with reasonable prudence or fails to conform to the standard of care that would be exercised by a reasonable person. *Id.*

In addition, Sections 17(a)(1) and (3) of the Securities Act make it unlawful for any person in the offer or sale of any securities to employ any device, scheme, or artifice to defraud; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. §§ 77q(a)(1), (3). A violation of Section 17(a)(1) require a showing that Heckele acted with scienter, *i.e.*, that he acted knowing or recklessly; whereas a violation of Section 17(a)(3) requires, at a minimum, a showing of only negligence. *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

    **2.  Second Claim – Section 10(b) of the Exchange Act**

To establish a violation of Section 10(b) and Rule 10b-5(b), the SEC must demonstrate by a preponderance of the evidence that the defendant:

    (1) made a material misrepresentation or omission;

    (2) in connection with the purchase or sale of a security;

    (3) with scienter;

    (4) in interstate commerce.

*SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). Scienter requires a showing that the defendant acted knowingly or recklessly. It does not

require a showing of willful intent to defraud. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990). Instead, scienter may be proven by a showing of "deliberate recklessness," which is an extreme departure from the standards of ordinary care presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it. *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018); *Hollinger*, 914 F.3d at 1569. Recklessness may be inferred from circumstantial evidence. *Platforms Wireless*, 617 F.3d at 1092; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

### 3. Claim Five – Section 20(a) of the Exchange Act

For its claim under Section 20(a) the SEC must demonstrate by a preponderance of the evidence that:

(1) there is a violation of the Exchange Act; and

(2) the defendant directly or indirectly controls any person liable for the violation.

*SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011).

A corporation acts through its officers, and the culpability of an entity's principals is imputed to the corporation. *See, e.g., SEC v. Platforms Wireless Int'l. Corp.*, 559 F. Supp. 2d at 1096. Accordingly, the SEC can show a violation of the Exchange Act by ECT1 and GGV by proving a violation of their managers.

For purposes of the Exchange Act, "control . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 230.405. Culpable participation or the actual exercise of power is not necessary. *See Hollinger*, 914 F.2d at 1575. Merely possessing the power to control the activities underlying the violations is sufficient. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2011).

Case No. 5:20-cv-01493-MCS-SHK

**C.     Brief Description of Key Evidence in Support of Each Claim**

**1.     Section 17(a) of the Securities Act**

In its January 26, 2022 Order, the Court determined that Heckele, by means of interstate commerce, obtained money or property by means of material misrepresentations, and that those elements of the Section 17(a)(2) claim are established for purposes of trial. ECF No. 83 at 10-11, 13. Accordingly, to prevail on its Section 17(a)(2) claim, the SEC need only prove that Heckele was negligent.

Heckele has admitted in his deposition that he had no experience in the cannabis industry. He has admitted that he formed ECT1 and GGV for the purpose of raising investor funds to invest in C Quadrant and Zabala Farms, and that at all relevant times he, with Lloyd, were the managing members of ECT1 and GGV. He has further admitted that, as a managing member of ECT1 and GGV, exercised day-to-day control over those entities, and directly and indirectly, controlled and conducted the ECT1 and GGV offerings. Finally, Heckele has admitted that he prepared PPMs and included the tables listing the projected returns on the first page of each basing those returns on "pro forma" financial statements he received from the Johnsons.

The SEC anticipates calling David Sheehan, who owned Zabala Farms, and Michael Gregory, who owned C-Quadrant. Their testimony will establish that Heckele did not perform reasonable diligence before including projected returns in the PPMs. Sheehan will testify that he prepared the Zabala Farms pro forma financial statements, but that he did not authorize or intend for them to be used in soliciting investments and that he did not represent in the pro forma financial statements that any amount of projected revenue would be immediately distributed to investors. Sheehan will also testify that Heckele never spoke with him about the pro forma financial statements.

Gregory will testify that C Quadrant had no operations, no title to real estate, no supply contracts, no distribution contracts, and did not have a completed

environmental study that was required by local law to operate. He will further testify that Heckele was aware of all of these impediments to C Quadrants business.

The SEC anticipates calling Charles Lloyd, who will testify (as he did in his deposition) that had solicited investors for the Valley View offering and that he had obtained an equity share in Zabala Farms through his shares of the Valley View offering. He will testify that he explained to Heckele how he had found and solicited potential investors through online ads and leads lists, and that he and Heckele's understanding was that Lloyd would continue his marketing efforts in the ECT1 and GGV offerings.

Lloyd will also testify that he and Heckele retained and supervised a team of sales agents who pitched the ECT1 and GGV investments to investors using sales scripts prepared by Lloyd. Lloyd will testify—and documentary exhibits will corroborate—that Lloyd shared his drafts of the sales scripts with Heckele. Lloyd will also testify that he copied Heckele on emails to investors. The SEC will introduce these emails and scripts, Lloyd will confirm that in both the scripts and the emails, he touted the projected returns Heckele included in the PPMs and that the scripts and emails implied to investors that the projected returns were the minimum returns investors in each offering could expect. The SEC will also introduce emails between Heckele and Lloyd demonstrating that Heckele knew Lloyd's statements were misleading. Lloyd will testify that no investors were contacted to correct the misleading statements.

Finally, Lloyd will testify that he was not receiving returns from his Valley View equity share that were in any way commensurate with the projected returns touted in the PPMs, scripts, and emails for GGV. Lloyd's testimony will establish that Heckele knew or had reason to know that the projected returns with respect to GGV were materially misleading.

The SEC will also call Heckele, whose testimony will establish that he was responsible for securities law compliance for the offerings but that he did not read or

review the sales scripts and emails that Lloyd shared with him. Heckele's testimony will establish that Heckele knew or had reason to know that the statements Lloyd and the sales agents were making to investors were misleading and will further establish that Heckele could have been more diligent in reviewing communications with investors.

Finally, the SEC will introduce evidence showing that Heckele himself represented to investors the C Quadrant extraction facility as having "everything in place, including permitting and licensing (for distribution), production, and distribution. . . . [a]nd, using only 'trim' from its own farms, can operate at 20% capacity immediately," when, in fact, Heckele knew or should have known the facility did not have all permitting in place to operate immediately. The same evidence will also demonstrate that Heckele touted relationships with suppliers that would enable the facility to achieve even higher returns than projected, even though he knew or should have known the facility had no supply contracts in place, again demonstrating his negligence with regard to the truth of his statements.

### 2.    Section 10(b) of the Exchange Act

Similar to the Section 17(a) claim, the Court has determined that Heckele made material misrepresentations in connection with the offer or sale of securities in interstate commerce and that those elements of the Section 10(b) claim are established for purposes of trial. ECF No. 83 at 13-14. Thus, the only remaining element is scienter, which can be established by a showing of deliberate recklessness.

The same evidence supporting a finding of negligence also supports a finding that Heckele acted recklessly with respect to the misstatements and omissions, thus establishing his violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5. In short the evidence will show that Heckele: knew or was reckless is not knowing that Lloyd's emails and sales scripts were misleading; knew or was reckless in not knowing that Zabala Farms was not in fact paying the touted returns to existing investors such as Lloyd; knew or was reckless in

not knowing that the extraction facility could not, in fact, "operate at 20% capacity immediately;" and he knew or was reckless in not knowing that no one involved with the ECT1 and GGV offerings were correcting any misleading statements to investors. In addition, the evidence, including Heckele's own testimony will show, that he knew both the ECT1 and the GGV ventures were extremely speculative, and so he knew or was reckless in not knowing that that the projected 100% returns were so tenuous as to make the claims misleading.

### 3. Section 20(a) of the Exchange Act

The Court has determined that Heckele exercised control over ECT1 and GGV. Thus, the SEC must only prove that either entity violated the Exchange Act to establish Heckele's liability for the violation under Section 20(a). The evidence set forth above establishes that both entities violated Section 10(b) through at least Lloyd's misrepresentations. Specifically, Lloyd—a co-manager of ECT1 and GGV— will testify that he intended his statements to convey that the 100 percent returns were the minimum investors could expect. Yet Lloyd knew that he was not receiving those returns from his own Zabala Farm investments and, in light of C Quadrant's non-existent operations, he knew or was reckless in not knowing that the extraction facility could not possibly generate the touted returns, at least in its first year. Lloyd's materially misleading statements establishes the entities' primary violations of Section 10(b) and Rule 10b-5.

### D. Summary Statement of Defendant's Affirmative Defense

The only applicable affirmative defense remaining for trial is Heckele's good faith defense to control liability under Section 20(a) of the Exchange Act..

### E. Elements Required to Establish Defendant's Affirmative Defense of Good Faith

Heckele has the burden of proving both of the following elements by a preponderance of the evidence:

(1) he did not directly or indirectly induce the violation; and

1    (2) he acted in good faith.

2    Heckele can prove good faith only by establishing that he maintained and enforced a

3    reasonable and proper system of supervision and internal control. *See* Ninth Circuit

4    Manual of Model Civil Jury Instructions § 18.11 (2017) (citing 15 U.S.C. § 78t(a)

5    and *Hollinger*, 914 F.2d at 1575-76).

6    ### F.    Brief Description of Key Evidence in Opposition to Defendant's
7    ### Affirmative Defense

8    Heckele will be unable to meet his burden to establish his good faith defense.

9    #### 1.    Heckele directly or indirectly induced the violation.

10   It is undisputed that Heckele himself chose to include the 100 percent projected

11   returns on the first page of the PPMs. Lloyd will testify that his misrepresentations in

12   emails and sales scripts were based on Heckele's inclusion of these projected returns.

13   #### 2.    Heckele did not act in good faith.

14   As noted above, the evidence will show that Lloyd shared the draft ECT1 sales

15   script with Heckele, but Heckele did not attempt to correct the misstatements it

16   contained. Lloyd also copied Heckele on emails that Heckele recognized were

17   misleading, but Heckele did nothing to correct the misrepresentations for the

18   investors to whom they had been made. Heckele implemented no internal controls or

19   system of supervision within either ECT1 or GGV to review solicitation materials

20   before they were provided to investors, even though Heckele was responsible for the

21   entities' compliance with the securities laws.

22   ### G.    Remedies

23   Upon a finding of liability (liability having already been found on the SEC's

24   registration and broker-dealer claims), the SEC requests that the Court enter

25   permanent injunctions against violations of the securities laws, full disgorgement of

26   the commissions received along with prejudgment interest, and a civil penalty.

27   #### 1.    Permanent Injunctions

28   Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of

10

Case No. 5:20-cv-01493-MCS-SHK

the Exchange Act, 15 U.S.C. § 78u(d), provide that when the evidence establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC. *Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d at 1295-96.  Factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *Murphy*, 626 F.2d at 633.

Here, all of those factors weigh in favor of a permanent injunction. Scienter, while a relevant factor, is not required to enter an injunction, especially of strict liability provisions such as Section 5 of the Securities Act and Section 15(a) of the Exchange Act. *See id.* Heckele did act with scienter here, as we was reckless with respect to representations made to investors about expected returns. Moreover, to date Heckele has shown no recognition for the wrongfulness of his conduct, but has instead has attempted to cast himself as nothing more than a glorified administrative assistant who was nevertheless entitled to half the transaction-based "management fee" collected from investor funds. Any assurances against future violations must, on the facts of this case, ring hollow.

Finally, Heckele, with Lloyd, conducted other unregistered offerings of securities following the ECT1 and GGV offerings. And Heckele's continued management of ECT1 and GGV, which includes negotiating securities transactions on behalf of ECT1, demonstrates the likelihood of future violations.

### 2.     Disgorgement with Prejudgment Interest

"A disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020). After *Liu*, on January 1, 2021, Congress amended Exchange Act Section 21(d) to add new subsection (d)(7), which expressly

authorizes courts to award disgorgement in Commission actions. 15 U.S.C. § 78u(d)(7). *See* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283. The SEC needs to produce only a reasonable approximation of the defendant's ill-gotten gains. *See Platforms Wireless*, 617 F.3d at 1096. Once the SEC establishes a reasonable approximation, the burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable. *Id.*

Here, the SEC's disgorgement calculation is undisputed: Lloyd and Heckele concede they collected a 15 percent transaction-based management fee from funds raised in the ECT1 and GGV offerings, totaling $536,475, which they split equally between them. Heckele has failed to put forward any evidence to meet his burden to demonstrate that the SEC's estimate is not reasonable. *See Platforms Wireless*, 617 F.3d at 1096. Despite requests by the SEC in discovery for documentation of expenses, Heckele has produced no evidence of expenses the Court should deduct before ordering disgorgement. *See Liu*, 140 S. Ct. at 1950.

The disgorgement award sought also here satisfies both Section 21(d)(7) and the standard in *Liu* because if the SEC is able to collect the requested disgorgement from Defendants a distribution to harmed investors is feasible. There are a limited number of investors in this case, who are identified, along with the amounts of their investment. Accordingly, a distribution would be relatively inexpensive to accomplish.

Last, disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Cross Fin. Services*, 908 F. Supp. 718, 734 (C.D. Cal. Sept. 5, 1995). Prejudgment interest may be calculated using the tax-underpayment rate. *See Platforms Wireless*, 617 F.3d at 1099.

Apart from any determination of the issues remaining for trial, disgorgement is appropriate based solely on Heckele's violation of Section 15(a) of the Exchange Act. The SEC requests that the Court Heckele each be ordered to disgorge one-half of the

management fees raised from the ECT1 and GGV offerings, that is, $268,237.50, together with prejudgment interest from November 1, 2018, until the date of judgment. *Accord SEC v. Liu*, No. SACV-16-00974-CJC, 2021 WL 2374248, at *10 (C.D. Cal. June 7, 2021).

### 3. Civil Penalty

Civil penalties are meant to punish the individual wrongdoer and to deter him and others from future securities law violations. *SEC v. Lyndon*, 39 F. Supp. 3d 1113, 1123 (D. Haw. 2014); *Kenton Capital, Ltd.*, 69 F. Supp. 2d at 17. Because civil penalties are imposed to deter the wrongdoer from similar conduct in the future, courts apply the injunction factors set forth in *SEC v. Murphy* in assessing penalties: the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of the defendant's professional occupation, that future violations might occur; and the sincerity of the defendants' assurances, if any, against future violations. 626 F.2d at 656; *see Lyndon*, 39 F. Supp. 3d at 1123-24.

The Securities Act and Exchange Act each provide that penalties shall be assessed according to a three-tier system. For each tier, the Court may impose a penalty up to the "gross amount of pecuniary gain." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The third, or highest, tier applies to violations that: (1) involve "fraud, deceit, manipulation, or reckless disregard for a regulatory requirement"; and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The antifraud violations here satisfy the third-tier criteria. For each violation, the maximum third-tier penalty is the greater of (1) $195,047 for a natural person for each violation occurring on or after November 3, 2015, or (2) the "gross amount of pecuniary gain" to the defendant as a result of the violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); *Adjustments to Civ. Monetary Penalty Amounts*, Release No. 5664 (Jan. 8, 2021).

Here, regardless of the outcome of the antifraud claims, the SEC requests a penalty in the amount of $195,047, which is less than Heckele's "gross amount of pecuniary gain" resulting from his violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act. The same reasons that warrant injunctions against violations of those provisions warrant a one-time penalty for Heckele's numerous violations. Heckele's violations of the antifraud provisions only buttress the appropriateness of a penalty in the amount of $195,047.

**H.      Anticipated Evidentiary Issues**

The SEC does not anticipate any evidentiary issues at trial.

**I.      Anticipated Issues of Law**

The SEC does not anticipate any legal issues at trial.

**J.      Bifurcated Issues**

All relief is to be determined by the Court.

**K.      Jury Trial**

Heckele demanded a jury trial in his Answer to the SEC's complaint pursuant to Federal Rule of Civil Procedure 38(b) The parties have stipulated, and the Court has ordered that all issues will be tried by the Court. ECF Nos. 86 & 87.

**L.      Attorney's Fees**

The SEC does not seek attorney's fees in this action.

**M.      Abandonment of Issues**

The SEC does not abandon any claims set forth in the Complaint.

Dated:  February 14, 2022

*/s/ Charles E. Canter*
Donald W. Searles
Charles E. Canter
Attorneys for Plaintiff
Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION,
> 444 S. Flower Street, Suite 900, Los Angeles, California 90071
> Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On February 14, 2022, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  February 14, 2022

*/s/ Charles E. Canter*
Charles E. Canter

1

1
2

***SEC v. Anthony Todd Johnson (aka Todd Johnson), et al.***
**United States District Court—Central District of California**
**Case No. 5:20-cv-01493-MCS-SHK**

3

## <u>SERVICE LIST</u>

4

5

Mark Heckele

mark@reallawtucson.com

6

*Pro Se*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28