**NOTE CHANGES MADE BY THE COURT**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

**Eastern Division**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>         Plaintiff,<br><br>   vs.<br><br>ANTHONY TODD JOHNSON, et al,<br><br>        Defendants. | Case No.  5:20-cv-01493-MCS-SHK<br><br>~~AMENDED [PROPOSED]~~ **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

1

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     FINDINGS OF FACT ....................................................................................2

    A.    Defendant's Connection to the Johnson Offerings ..............................2

    B.    The ECT1 and GGV Offerings ...........................................................3

    C.    The Fraud .............................................................................................6

        1.    Misrepresentations regarding ECT1 ........................................6

        2.    Misrepresentations regarding GGV .......................................13

III.    CONCLUSIONS OF LAW ..........................................................................17

    A.    Embedded false statements of material fact.......................................17

    B.    Section 17(a)(2) and (3) of the Securities Act ...................................19

        1.    Elements...................................................................................19

        2.    Negligence ..............................................................................19

    C.    Section 17(a)(1) of the Securities Act, and Section 10(b) of the
          Exchange Act and Rule 10b-5............................................................21

        1.    Elements...................................................................................21

        2.    Scienter ...................................................................................22

    D.    Section 20(a) of the Exchange Act.....................................................24

        1.    Elements...................................................................................24

        2.    Exchange Act Violations by ECT1 and GGV ........................24

        3.    Heckele's Lack of Good Faith ................................................25

    E.    Remedies ............................................................................................26

        1.    Permanent Injunctions ............................................................26

        2.    Disgorgement with Prejudgment Interest ...............................28

        3.    Civil Penalty............................................................................29

IV.     CONCLUSION.............................................................................................31

## I.  **INTRODUCTION**

This is a civil enforcement action filed by the Securities and Exchange Commission ("SEC") against nine issuer entities and their respective principals and control persons in connection with a series of securities offerings to finance two marijuana businesses, a new marijuana farm and a proposed cannabidiol ("CBD") extraction facility, both located in Salinas, California. The SEC alleges that, between 2017 and 2018, these defendants violated the registration provisions of Section 5 of the Securities Act of 1933 (the "Securities Act"), the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and/or the broker registration provisions of Section 15(a) of Exchange Act. All of the defendants, save Defendant Mark Heckele, consented to judgments against them.

With respect to Heckele, the Court on January 26, 2022 granted in part the SEC's motion for summary judgment and determined that Heckele violated Section 5 of the Securities Act and Section 15(a) of the Exchange Act. ECF No. 83. The Court further determined that Heckele, by means of interstate commerce, obtained money or property by means of material misrepresentations within the meaning of Section 17(a)(2) of the Securities Act but reserved the issue of his negligence for trial. In addition, the Court determined that Heckele made material misrepresentations in connection with the offer or sale of securities in interstate commerce and that those elements of the Section 10(b) of the Exchange Act and Rule 10b-5 had been satisfied but reserved the issue of his scienter for trial. Finally, the Court determined that Heckele was a control person for purposes of Section 20(a) of the Exchange Act but reserved the question of whether the entities he controlled violated the Exchange Act.

The SEC asks the Court to enter a final judgment that: (1) enjoins Heckele from further violations of the respective securities laws; (2) orders Heckele to disgorge all ill-gotten gains and pay pre-judgment interest thereon; and (3) orders Heckele to pay civil monetary penalties. Following a bench trial on March 22 and 23,

2022, the Court now finds that the SEC has proven its claims by a preponderance of the evidence and will enter judgment as to all claims in favor of the SEC.

Based on the admitted facts set forth in the Final Pretrial Conference Order incorporated herein, ECF No. 111, and the testimony[1] and exhibits received into evidence at trial, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52:

## II.   FINDINGS OF FACT

### A.   Defendant's Connection to the Johnson Offerings

1.      Heckele is a practicing attorney, admitted to practice in Arizona and Washington. He has never held any securities licenses and has never been registered with the SEC in any capacity. ECF No. 111 (Admitted Fact #1).

2.      Heckele is not a securities lawyer, and he did not act as an attorney for, or provide legal advice to, the entities and individuals at issue in this case. *Id*., (Admitted Fact #2).

3.      Heckele's friend, Defendant Charles Lloyd, has a background in web development and internet marketing and consulting.

4.      Before the events that gave rise to this case, neither Heckele nor Lloyd had any experience in the cannabis industry. ECF No. 111 (Admitted Fact #3).

5.      In the fall of 2017, Defendants Todd and Jeremy Johnson contacted Lloyd to do web-based advertising for their upcoming "Valley View offering," which would invest in a new marijuana farm in Salinas, California called "Zabala Farms."

6.      Instead of purchasing Lloyd's leads, the Johnsons proposed that Lloyd use a script given to him by the Johnsons and sell the investments himself, along with Rhonda Spears. Lloyd agreed. He began contacting his leads and, with Spears, sold

[1] In addition to live testimony, the Court also received into evidence declarations from Heckele and David Sheehan, Heckele's deposition testimony in this case, and Heckele's testimony given pursuant to an SEC administrative subpoena while the SEC was investigating the conduct that gave rise to the SEC's Complaint.

the investments. Lloyd was paid a commission on each sale as well as an equity share in the offering, giving him an equity share in Valley View.

7.     Lloyd solicited investors by placing ads on publicly available websites such as Facebook and Instagram. He also placed ads on a publicly available website he created called gbifarms.com.

8.     The ads Lloyd created advertised 100 percent annual returns, following the scripts the Johnsons gave him. Prospective investors who saw the ads would provide contact information in an online form. Lloyd would put this contact information into a spreadsheet of leads and then call the potential investors.

9.     When calling potential investors, Lloyd used a sales script that touted minimum 100 percent annual returns. After the call, Lloyd would email the Valley View private placement memorandum to the investor. His emails attaching the private placement memorandum also touted the minimum 100 percent annual returns.

10.     Lloyd's equity shares in Valley View never resulted in the distributions Lloyd had promised to investors. Lloyd received approximately $265,000 in commissions from the Johnsons for approximately six weeks of work, a fact he emphasized to Heckele.

11.     Following Lloyd's success in raising investor funds for the Valley View offering, Todd Johnson suggested that Lloyd pool his own capital and invest in C-Quadrant, a proposed CBD extraction facility the Johnsons and Defendant Michael Gregory were planning.

**B.     The ECT1 and GGV Offerings**

12.     Lloyd decided he would need help conducting his own offering, so he contacted Heckele. Lloyd and Heckele partnered together to raise investor funds. At the time, Heckele did not know the Johnsons or the principals at either Zabala Farms or C-Quadrant.

13.     Heckele put his law practice on hold to work full time on the offerings in this case.

14.     In January 2018, Heckele created Extraction Capital Tier 1, LLC ("ECT1"), naming himself and Lloyd as the two managing members. They began raising investor funds that month for the purpose of investing in C-Quadrant. The ECT1 offering ran from mid-January 2018 through mid-September 2018. ECF No. 111 (Admitted Fact #7, 8).

15.     In March 2018, Heckele and Lloyd decided to raise investor funds to invest in Zabala Farms, so they created Green Growth Ventures, LLC ("GGV") in approximately March 2018. As with ECT1, they were GGV's managing members. The GGV offering ran from mid-March 2018 through mid-June 2018. ECF No. 111 (Admitted Fact #7, 8, 10).

16.     Heckele and Lloyd remain the managing members of ECT1 and GGV.

17.     Heckele prepared the ECT1 and GGV private placement memoranda ("PPMs), and he and Lloyd had final authority over the contents of each of them. ECF No. 111 (Admitted Fact #13).

18.     Lloyd had explained to Heckele how he had found and solicited potential investors through online ads and leads lists. At the start of the ECT1 offering, Lloyd provided his lead list to Heckele. That list contained more than 13,000 entries.  Lloyd did not have a preexisting relationship with any of the persons on that list. ~~Their~~**Heckele's** understanding was that Lloyd would continue his marketing efforts in the ECT1 and GGV offerings.

19.     Lloyd did, in fact, market the ECT1 and GGV offerings by placing ads on Facebook, Instagram, and Craigslist.

20.     Heckele and Lloyd retained and supervised sales agents, who pitched the ECT1 and GGV securities to potential investors at Heckele's and Lloyd's direction. The sales agents followed sales scripts prepared by Lloyd and shared with Heckele.

21.     Beginning in April 2018, Heckele and Lloyd decided they would begin to sell the securities only to accredited investors. ECF No. 111 (Admitted Fact #29).

22.      Heckele understood the meaning of "accredited investor" and the

4

requirements of the Rule 506(c) exemption, under which he and Lloyd planned to conduct the GGV offering. In an April 2, 2018 email to Lloyd and the sales agents, Heckele emphasized the need for "reasonable efforts" to verify accredited status. He elaborated:

> For income-based accredited investors, we need to obtain two prior years' tax returns and/or pay stubs.
>
> For net worth-based accredited investors, we need the investor to prove that he or she has the requisite net worth by providing (e.g.) accounts statements (e.g., bank, brokerage, retirement, etc. accounts), other asset disclosed, and perhaps even a credit report, and they also need to disclose their liabilities.
>
> In the alternative, under either scenario, a prospective investor may provide a letter from a 'professional' (e.g., a registered broker-dealer, investment adviser (registered with the SEC), a licensed attorney, or a CPA) stating that he/she is an accredited investor.

ECF No. 111 (Admitted Fact #21).

23.    Heckele also directed Lloyd and the sales agents to an online article entitled "Everything You Need to Know about Accredited Investor Verification." Finally, he emphasized that "[w]e need all of you to make sure we obtain the appropriate verification of accredited status for each prospective investor before we can accept money from them." *Id*. (Admitted Fact #22).

24.    Heckele knew that, to satisfy the requirements of Rule 506(c), "taking the investor's "word" (in the Subscription Agreement) is not good enough." *Id*. (Admitted Fact #23).

25.    Nevertheless, on the evening of April 2, 2018, Heckele again replied to all recipients of his earlier email, stating that he and Lloyd "decided to take the onus to acquire verification of accredited investor status of [sic] of you [the sales agents] and to place it upon the investor (and me :)[.]" Specifically, Heckele and Lloyd would

not require any documentation to verify accredited status but would simply rely on an investor's representation of accredited status. Heckele and Lloyd also required investors to hold the Heckele and Lloyd harmless if the investors were not, in fact, accredited within the meaning of Regulation D.

26.    Because they relied on investors' representations, Heckele had no evidence that would demonstrate that all of the investors in the GGV offering were, in fact, accredited. ECF No. 111 (Admitted Fact #25).

27.    Heckele and Lloyd collected a 15 percent management fee from each sale of the ECT1 and GGV offerings.

28.    Heckele and Lloyd collected $423,225 in fees in the ECT1 offering and $113,250 in fees GGV offering, for a total of $536,475, which they split evenly between themselves. In other words, Heckele received ~~approximately~~ $268,237.50 from the two offerings.

## C.    The Fraud

### 1.    Misrepresentations regarding ECT1

29.    On the first page of the ECT1 PPM, Heckele put a table containing a projected annual return on investment of 33 percent in 2018 and 100 percent for each year from 2019 through 2022. In his own words, Heckele included this table to provide "a snapshot of what the investment looks like." ECF No. 111 (Admitted Fact #26). The Court has previously found that these representations on returns on investment were materially misleading.  Based on the evidence at trial, the Court further finds that Heckele knew~~, or was reckless in not knowing,~~ that these representations on returns on investments were materially misleading.

30.     Heckele calculated the projected returns from a projected, pro forma financial statement for C-Quadrant provided by the Johnsons to Lloyd; Heckele himself did not know who prepared the financial statements or the basis for them. ECF No. 111 (Admitted Fact #27).

31.    In fact, the pro forma was prepared by Gregory as one of many "pricing

models" he had created in late 2017 to evaluate possible lines of business and revenue streams C-Quadrant might pursue. Gregory did not intend the pro forma to be used to solicit investors.

32.     The pro forma Heckele incorporated into the ECT1 PPM assumed that C-Quadrant would acquire an operating cannabis farm that would immediately yield more than $1.2 million in revenue from monthly cultivation sales and $250,000 in revenue from oil extraction. These revenue streams account for more than 35% of projected 2018 revenue and more than 10% of projected revenue in subsequent years.

33.     However, C-Quadrant abandoned any plan to acquire a cannabis farm by the time Heckele began the ECT1 offering.

34.     Throughout the ECT1 offering, Heckele never inquired about whether C-Quadrant had acquired a farm, was producing any oil, or was otherwise achieving the revenue projected in the ECT1 PPM. Heckele never reviewed any financial statements of C-Quadrant's actual performance, and he never spoke with Gregory about the pro forma or the returns Heckele had projected based on those pro forma. Heckele did not even visit the site for the proposed C-Quadrant facility until February 2018, after he and Lloyd had raised more than $300,000 from investors.

35.     On the first page of the ECT1 PPM, Heckele described C-Quadrant as "permitted." In an "Executive Summary" prepared in late February 2018 to be sent to prospective investors, Heckele described C-Quadrant as a "permitted" CBD oil extraction and cultivation facility. Heckele knew that C-Quadrant did not have all necessary permits to operate at the time he drafted the PPM, the Executive Summary, and throughout the ECT1 offering, as shown by a draft business plan that Heckele had helped prepare listing obtaining permits and licenses as C-Quadrant's objectives. Lloyd knew at the time of the ECT1 offering that C-Quadrant did not have permits to operate.

36.     In fact, C-Quadrant did not obtain all necessary permits until June 2021.

37.     Heckele understood that the projections he touted in the ECT1 PPM and

the Executive Summary assumed a minimum supply of 12,000 pounds of raw material per week. Heckele never asked to see any supply contracts or any sales contracts.

38.     The Executive Summary also stated that C-Quadrant "will begin operating at not less than 20% capacity on day-one due to its Principals' current farming operations, connections with local farmers, and in-place distribution network."

39.     C-Quadrant had no "in-place distribution network." As of January 2018, ECT1 had no operations, no supply contracts, no sales contracts, and no distribution network.

40.     Moreover, Heckele knew at the time that C-Quadrant would not begin operating until at least October 2018, eight months later. Yet nothing in the Executive Summary or the PPM conveyed this fact to prospective investors.

41.     The return on investment ("ROI") table that Heckele prepared and presented on the first page of the ECT1 PPM was based on the assumption that C-Quadrant would distribute 100% of its net revenues to investors. At trial, however, Heckele testified that there was no agreement in place for C-Quadrant to do that and that no one represented to him that C-Quadrant planned to distribute all revenues to investors.

42.     The Court finds that the statements regarding C-Quadrant's permitting and distribution network were materially misleading. The Court further finds that Heckele knew, or was reckless in not knowing, that these representations regarding C-Quadrant were materially misleading.

43.     On January 15, 2018, Lloyd sent an email that included the ECT1 PPM as an attachment and wrote to an investor:

> Finally, the documents have arrived and it's like Wal Mart on Black Friday. Everyone is rushing to get into Tier 1 while it's still here. The PPM is attached. Assuming you are ready to pick up your 100% annual

1  return shares, here are the wire instructions.

2  ECF No. 111 (Admitted Fact #28).

3  44.    Heckele was copied on the January 15, 2018 email, but he ignored it. In

4  May 2019, while under investigation by the Commission, Heckele replied to Lloyd's

5  January 15, 2018 email, saying "[e]mails like this are tough." ECF No. 111

6  (Admitted Fact #32). Heckele told the SEC that he wrote this because "an investor

7  could perceive this [reference to "100% annual return shares] as a guarantee on

8  investment." Heckele admitted that words of a guarantee to a prospective investor

9  would be materially misleading.

10  45.    On January 16, 2018, Lloyd emailed the ECT1 private placement

11  memorandum to another potential investor and wrote:

12  [T]he ink is dry on your 100% annual return shares for the world's

13  largest cannabis extraction plant.

14  * * * *

15  Distributions from the plant begin in November [o]f this year so you'll

16  make 31% back this year and then get the quarterly returns at 25% per

17  quarter (100% per year) from that point forward. (Example: 100K

18  invested earns 100K per year).

19  * * * *

20  The first 100 investors make up Tier I which pays 100%

21  46.    By January 19, 2018, Lloyd had prepared a script, which he shared with

22  Heckele, for sales agents to use in calls with potential investors. The script stated that:

23  [I]nvestors [in the Johnson offerings] are making great returns – some at

24  200% annual returns, 150%, 100%, etc.

25  * * * *

26  I mean, the PPM says 100% annual returns, which sounds great right and

27  too good to be true to most people . . . But with this project, 100%

28  annual returns are like a worst case scenario

9

* * * *

Actually, It's [sic] a ridiculous understatement. The fact is that the $75 Million in net profit we project in 2018 only accounts for the EXISTING distribution that we have in place today - you know, the same customers that stock the flower from our farms are going to stock our oils - same sales channels. Well, that is only 20% of the capacity of the facility. So in 2020, when big retail and new wholesale and white label contracts come in, because they will for the largest facility that can produce at the lowest cost, that number conservatively doubles, taking the plant to a 40% capacity at least which does what to your bottom line? Doubles it - and you make 200% instead of 100%. The plant goes to 80% capacity in year 3, and your [sic] at 400% annual return.

* * * *

A farm is going exit at a 3-5X factor. The plant, 8X-10X.

So how does that effect your investment?

Let's take a round number and like $100,000. Take $100,000 - year one, we just sell to our existing customers. Year 2, we go to 40% production because we apparently were pretty bad at selling in a market that's growing at lightning speed while we sit on the world's most efficient facility - so, only 200% in 2020. 2021, we sort of get our shit together and start producing at 80% capacity- 400% return that year in year 3. We're gone in year 4. Don't plan on being in this thing past then. Using that same $100,000, you'll go out at a minimum of $800,000 on the exit. So, that's how you conservatively turn $100,000 in to $1.5 Million in 4 years.

And that's why the PPM is ultra ultra conservative. But hey, that's what lawyers do right? They make you use worst case scenarios when presenting forward looking statements. The other managing partner is a

[sic] an attorney, Mark Heckele, and he drafted the PPM document you have that says 100% annual returns. So, like I said, 100% annual returns is a joke - it's a major understatement of reality."

47.     Heckele and Lloyd's sales agents used Lloyd's sales script to solicit investments in ECT1.

48.     Lloyd's intent in the script and emails was to imply that a 100 percent annual return was the worst-case scenario or minimum return for the ECT1 securities.

49.     ~~Heckele claims that he ignored the sales script, even though he understood Lloyd and their sales agents would be soliciting investments in ECT1 and was also aware that misleading investors about returns could violate federal securities laws.~~

50.     ~~At no point during either offering did Heckele have a policy to review statements about the ECT1 and GGV securities before those statements were disseminated to investors.~~

51.     Many emails similar to the January 15 and January 16 emails were sent to investors. Heckele was forwarded or copied on several of these emails, but he never corrected any of the misrepresentations to investors.

52.     Indeed, Heckele himself—contrary to his sworn declarations offered at trial, ECF No. 101, and with his opposition to the SEC's Motion for Summary Judgment, ECF No. 73-3—touted the merits of the ECT1 offering to investors.

53.     For example, Heckele noted in a February 21, 2018 email explaining the 15 percent management fee that "the ROI is still excellent."

54.     In a February 24, 2018 email answering some questions from a prospective investor, Heckele represented that the first distribution from C-Quadrant would be made around January 1, 2019 at "(~21% ROI); and quarterly distributions (25% ROI) thereafter (in 'perpetuity')." Heckele went on to emphasize the even greater projected upside, implying that the projected returns were the minimum and that at full capacity, returns may be "as much as 500% year-over-year."

55.     In a February 27, 2018 email, Heckele stated:

a number of farming  . . . operations have reached out to 'us' to process their trim and assist in distribution – many strategic partnerships are in bloom, which bodes well for C-Quads increased production capacity (if you recall, C-Quads *pro forma* was based on only 20% capacity).

56.     On March 1, 2018, Heckele sent the PPM to some potential investors and wrote that C-Quadrant "has everything in place, including permitting and licensing (for distribution), production, and distribution. And, using only 'trim' from its own farms, can operate at 20% capacity immediately." None of these statements were true.  The Court notes that even though Heckele stated in his March 1, 2018 email that "we and many others are really excited about this opportunity," Heckele did not invest any of his own money in ECT1.

57.     The Court finds that the forgoing documentary evidence squarely contradicts Heckele's declaration of his direct testimony that he "never misrepresented any information . . . in respect of the ECT1 or GGV offerings." ECF No. 101, at 12. The evidence also contradicts his earlier declaration that he "neither actively or directly participated in the marketing or sales of securities;" "never discussed the merits of the ECT1 or GGV offerings with prospective investors;" and that "any communication [Heckele] had with prospective investors in ECT1 and GGV was limited to administrative matters." ECF No. 73-3 ¶ 35. In light of these inconsistencies and the Court's assessment of Heckele's credibility during cross-examination, the Court finds Heckele's testimony to be not credible and accords little, if any, weight to his declarations ~~and testimony~~.

58.     In addition to their own misrepresentations to investors, Heckele and Lloyd, through their sales agents, caused a recorded PowerPoint presentation prepared by Defendant Todd Johnson to be sent to prospective investors. This presentation contained many false and misleading statements. Investors were falsely told that C-Quadrant was "fully capable" of producing CBD oil; that C-Quadrant had

12

a "Ph.D. leadership team;" and that "UCLA medical scientists" were going to lease part of the C-Quadrant facility to conduct research on CBD oil. And investors were assured multiple times that the C-Quadrant's product was "already spoken for," that C-Quadrant has "already filled out our bottom line," and that if C-Quadrant did nothing else beyond what was set forth in the pro forma, investors will have "already won."

59.    Heckele and Lloyd had both reviewed the presentation, but Heckele did nothing to verify any of the statements contained in it, nor did Heckele at any time instruct Lloyd or the sales agents not to send the presentation to prospective investors. Heckele also knew that the statement that C-Quadrant was "fully capable" of producing CBD oil was false as **he knew** C-Quadrant did not have the equipment, or the permits, in place to actually produce the product.

### 2.    Misrepresentations regarding GGV

60.    As with ECT1, Heckele placed a table of projected returns on the front page of the GGV private placement memorandum. In the final version, Heckele projected annual returns of more than 132 percent each year from 2018 through 2022. The Court has previously found that these representations on returns on investment were materially misleading.  Based on the evidence at trial, the Court further finds that Heckele knew, or was reckless in not knowing, that these representations on returns on investments were materially misleading.

61.    Heckele based the projected return on investment for GGV on Zabala Farms' pro forma financial projections he had received from the Johnsons through Lloyd, but he did not know who prepared those projections.

62.    The ROI table that Heckele prepared and presented on the first page of the GGV PPM was based on the assumption that Zabala Farms would distribute 100% of its net revenues to investors. Heckele never verified that Zabala Farms had agreed to do that.

63.    The pro forma Heckele relied upon had been prepared in September

2017 by David Sheehan, one of the owners of Zabala Farms. Sheehan prepared the pro forma for management purposes only, not to solicit investors. ECF 100 (Sheehan Declaration).

64.     Sheehan also did not intend for the pro forma financial statements to imply immediate cash distributions to investors. Zabala Farms financial statements do not indicate immediate distributions.

65.     The pro forma contained a long list of assumptions, and they provided for a range of production estimates ranging from 24 grams to 36 grams of marketable product per square foot. They also assume that both of Zabala Farms' greenhouses would be fully utilized throughout 2018.

66.     Although the Zabala Farms pro forma financial projections set forth a range of possible annual revenue, Heckele included only the highest projected revenue in the projected ROI table in the GGV PPM, based on production of 36 grams per square foot.

67.     In fact, the pro forma Heckele relied upon and incorporated into the GGV PPM are internally inaccurate in that the monthly net income projections for 2018 do not sum to either the 24 grams per square foot or 36 grams per square foot projected totals. The Court accordingly concludes that Heckele failed not only to inquire about any of the assumptions underlying the projections but failed even to perform a cursory check of arithmetic before touting 130 percent returns to investors.

68.     Heckele also included in the GGV PPM Zabala Farms' actual 2017 financial statements, which showed a net loss of more than $600,000. The pro forma Heckele relied upon had projected a profit of $5.3 million in 2017.

69.     By the time the GGV offering began in March 2018, Heckele knew, ~~or was reckless in not knowing,~~ that Lloyd was not receiving 100 percent returns for his equity share in Valley View.

70.     Moreover, the pro forma incorporated into the GGV PPM reflected monthly profit of hundreds of thousands of dollars for each month of 2018, a drastic

swing from Zabala Farms actual 2017 performance. Yet Heckele never attempted to confirm Zabala Farms' 2018 performance.

71.     Heckele received several updates from Zabala Farms before and during the GGV offering that further demonstrated that the projections he touted to investors had no basis in reality. A March 9, 2018 "Developmental Report" included pictures of an empty greenhouse. A March 21, 2018 report referred to "working on construction" on the second greenhouse. Finally, a May 24, 2018 update stated that Sheehan was "confident that Zabala could produce 5 harvests annually and see as much as 25 grams pulled per square foot," well short of the 36 grams per square foot that was embedded in the projections Heckele provided to investors.

72.     On March 22, 2018, Lloyd emailed an investor, blind carbon copying Heckele, and said, "[w]e are offering investors a 183% annual return on their partner shares." Lloyd attached the GGV private placement memorandum to the email.

73.     Heckele responded to Lloyd's March 22, 2018 email writing,

> Instead of saying that we are currently offering 187% Roi, you should just say that the prospective return on the investment is 187% per annum. The term offering makes it sound like a guarantee or an annuity or something to that effect . . . .

ECF No. 111 (Admitted Fact #35).

74.     Lloyd also prepared a script that sales agents used to solicit investors, telling the investors, "This Cannabis Farm investment pays 183% annual returns." Lloyd himself promoted projected returns on calls with potential investors.

75.     At no time did Lloyd or Heckele clarify to investors that the minimum returns were not guaranteed, that they were based on the highest projections, or that Lloyd, as an equity holder in Valley View, was not receiving distributions anywhere close to the projected returns provided to potential investors.

76.     At no time did Heckele revise the projections in the PPM or clarify to investors that Zabala Farms was not actually producing at the rates represented in the

PPM.

77.     In his investigative testimony to the SEC, Heckele conceded that he could have been more diligent in reviewing communications with investors. ECF No. 111 (Admitted Fact #37).

78.     Heckele and Lloyd did not ~~retain any experts or consultants~~ **try** to assess the potential production capabilities of either business, nor did they ~~retain any consultants or attorneys~~ **try** to determine whether the extraction lab would obtain the necessary permits to operate. ECF No. 111 (Admitted Fact #38).

79.     To date, GGV has returned only about 2 percent per year to investors. *Id.* (Admitted Fact #39).

80.     ECT1 has paid no returns to investors.  ECF No. 111 (Admitted Fact #34). In June 2021, C-Quadrant's assets were sold to Lowell Farms, Inc. Heckele distributed Lowell Farms stock to ECT1 investors on February 2, 2022, when the stock was worth approximately $0.30 per share, representing a significant loss to ECT1 investors.

81.     In addition to the ECT1 and GGV offerings, Heckele and Lloyd have conducted at least two other unregistered offerings. ECF No. 111 (Admitted Fact #40). Each offering raised about $1 million from several dozen investors.

82.     Heckele, with Lloyd, continues to manage each of the offering entities and continues to communicate with investors.

83.     Statements by Heckele, Lloyd, and their sales agents regarding expected returns from the ECT1 and GGV offerings were contained material misrepresentations and omissions of material fact making what was said materially misleading.

84.     Lloyd's statements implying guaranteed 100% returns or greater were material misrepresentations made with scienter.

85.     Lloyd was acting in the course and scope of his authority, and on behalf of ECT1 and GGV, when he made statements to prospective investors in each of

16

those offerings implying guaranteed returns.

86.     Heckele obtained money or property by means of Lloyd's and their sales agents' materially misleading statements regarding expected returns from the ECT1 and GGV offerings.

87.     Heckele failed to exercise reasonable care, in his capacity as a managing member of both ECT1 and GGV, to review and correct Lloyd's and the sales agents' statements regarding expected returns from the ECT1 and GGV offerings.

88.     Heckele prepared the ECT1 and GGV private placement memoranda and was the maker of the statements contained therein, including the materially misleading statements on the first page of the each of those PPMs' regarding expected rates of return.

89.     Heckele knew, or at a minimum was reckless in not knowing, that statements in the ECT1 and GGV PPMs regarding expected rates of return were false and materially misleading.

90.     As co-manager of ECT1 and GGV, Heckele had ultimate authority over statements made by Lloyd and the sales agents in marketing the ECT1 and GGV securities.

91.     Heckele acted with scienter in describing C-Quadrant as "permitted" in the ECT1 PPM and the ECT1 Executive Summary.

92.     Heckele acted with scienter in projecting ECT1's returns based on the C-Quadrant pro forma.

93.     Heckele acted with scienter in projecting GGV's returns based on the Zabala Farms pro forma.

## III.     CONCLUSIONS OF LAW

### A.     Embedded false statements of material fact

94.     The SEC's Section 17(a) and Section 10(b) claims each require material false statements or omissions. *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th Cir. 2001); *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir.

17

2010). At summary judgment the Court concluded that statements to investors regarding 100 percent returns were materially misleading because they omitted material facts about C-Quadrant and Zabala Farms that caused them to be misleading to a reasonable person. ECF No. 83 at 11 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 616 (9th Cir. 2017)). In light of the evidence presented at trial and the facts found above, the Court also concludes that the projections Heckele calculated and included in the PPMs and the ECT1 Executive Summary were misleading, not only because they suggested 100 percent returns or greater, but because they also contain embedded statements of material facts that are false. *See Dearborn Heights*, 856 F.3d at 616.

95.     Embedded in the ECT1 projections are the statements that C-Quadrant, as of January 1, 2018, had acquired an operating marijuana farm and had the capacity to begin immediately extracting oil from the trim of that farm's produce and that the revenue from the sale of marijuana and the oil produced from the trim accounts for more than 35% of the ECT1 projected revenue for 2018. But C-Quadrant had no farm, no equipment, and lacked the requisite permits to extract oil.

96.     Embedded in the GGV projections are the statements that Zabala Farms, as of January 1, 2018, had two completed greenhouses with more than 145,000 square feet under cultivation, yielding 36 grams of marketable product per square foot. In fact, the second greenhouse was not completed until sometime in the second quarter of 2018, and at no time during the GGV offering did Zabala Farms achieve a 36 grams per square foot yield.

97.     Moreover, the projections for both offerings projected monthly profit each month of 2018. With the passage of time, however, C-Quadrant's and Zabala Farms' monthly income (actually, monthly losses) ceased to be a subject of projection but instead became a subject of historical, verifiable fact. The ECT1 offering ran from mid-January 2018 through mid-September 2018, so for the majority of that time, the PPMs misleadingly indicated that C-Quadrant was making millions

18

in profits, when it actually had no revenue at all. In the case of the GGV offering, which did not begin until late March 2018, investors similarly received PPMs indicating monthly profits in the beginning of 2018 that had, in fact, never materialized.

98.     As noted in the Court's summary judgment order (ECF No. 83 at 11), statements about an entity's financial condition are material. Here, the statements embedded in Heckele's projections bore directly on the underlying businesses' financial condition and were therefore material. Likewise, the monthly projected profits became false statements of fact with the passage of time and were material.

**B.     Section 17(a)(2) and (3) of the Securities Act**

**1.     Elements**

99.     Violations of Section 17(a)(2) and (3) require a showing that Heckele acted at least negligently. *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007). To prove a Section 17(a)(2) violation, the SEC must demonstrate by a preponderance of the evidence that the defendant (1) by means of interstate commerce (2) obtained money or property (3) by means of a material false statement or omission and (4) acted at least negligently. *Dain Rauscher, Inc.*, 254 F.3d at 855 n.2. As noted, the Court determined at summary judgment that the first three elements have been established.

100.     Section 17(a)(3) makes it unlawful to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a)(3). Here, the conduct constituting the fraudulent course of business overlaps with the making of material misrepresentations in the PPMs, emails to investors, and sales scripts. *Cf. Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) (noting the same underlying conduct may establish a violation of more than one subsection of the antifraud provisions).

**2.     Negligence**

101.     A person acts negligently when he or she fails to act with reasonable prudence or fails to conform to the standard of care that would be exercised by a

reasonable person. *Dain Rauscher, Inc.*, 254 F.3d at 856.

102.   The evidence shows that Lloyd sent an email to share his sales script for the ECT1 offering with Heckele on January 19, 2018. That sales script contained numerous material misrepresentations intended to create the impression that the 100 percent returns were guaranteed. Lloyd also copied Heckele on emails with investors in which Lloyd made similar misrepresentations.

103.   While Heckele claims not to have reviewed the sales script or the emails at the time, a reasonable person under the circumstances would at least review communications his agents **and his co-manager** are making to investors—especially when Heckele had taken it upon himself to oversee compliance with securities laws. Heckele conceded that he could have been more diligent in reviewing Lloyd's communications with investors. Indeed, he was negligent in not being more diligent.

104.   Heckele notes that when he did become aware that Lloyd's communications were potentially misleading, he told Lloyd not to make statements that could be construed as guarantees. But even with knowledge that misleading statements had been made to investors, Heckele made no attempt to ensure that those investors were not misled, and he directed no one on behalf of the entities to contact investors to correct the misstatements. A reasonable person exercising ordinary prudence would have done so.

105.   Moreover, no reasonable person acting with ordinary prudence would tout 100 percent returns for these investments. Heckele based the returns on pro forma financial statements prepared by third parties, and he failed to take reasonable steps to verify the numbers underlying these statements. He had no experience in the cannabis industry and failed to consult with ~~any expert~~ **anyone** to evaluate the statements.

106.   With respect to the ECT1 offering, Heckele relied on the representations of Gregory and the Johnsons. He did not review any supply or sales contracts (none existed). He did not confirm that that C-Quadrant had completed all necessary legal

requirements to operate (it had not). And he failed to confirm that C-Quadrant actually procured the machines necessary produce any product for sale (it never did). Finally, during the course of the offering, Heckele at no time confirmed whether ECT1 was realizing any profit or even whether ECT1 had acquired a marijuana farm. Heckele's lack of diligence, while touting 100 percent returns to investors, was altogether unreasonable and, at the very least, negligent.

107.   With respect to the GGV offering, Heckele failed even to check the arithmetic in the pro forma financial statements he incorporated into the GGV PPM. He also failed to review the statements with David Sheehan, who had prepared them. Had Heckele done so, he would have learned that Sheehan did not intend those statements to be used to solicit investors and did not intend those statements to imply that cash returns would be paid to investors. As with ECT1, Heckele did nothing to verify whether the projections he touted were realistic or whether, during the offering, Zabala Farms was actually achieving the production and profits projected. Given that Lloyd's own equity shares from the Valley View offering were not providing anything close to 100 percent returns, it was at least negligent to tout such returns to GGV investors.

108.   The Court concludes Heckele violated Section 17(a)(2) and (3) of the Securities Act.

## C.   Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5

### 1.   Elements

109.   Both Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange require the SEC to demonstrate that Heckele acted with scienter, ~~*i.e.*, that he acted knowingly or recklessly~~. *SEC v. Phan*, 500 F.3d at 908. To establish a violation of Section 10(b) and Rule 10b-5(b), the SEC must demonstrate by a preponderance of the evidence that the defendant (1) made a material misrepresentation or omission (2) in connection with the purchase or sale of a

security (3) with scienter (4) in interstate commerce. *SEC v. Platform Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). Like the Section 17(a) claim, the Court determined that the SEC established all elements except scienter at the summary judgment stage.

### 2.    Scienter

110.    Scienter requires a showing that the defendant acted knowingly or recklessly. It does not require a showing of willful intent to defraud. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir. 1990). ~~Even if the defendant does not possess actual knowledge of the underlying facts, knowing conduct includes "deliberate ignorance," *i.e.* the defendant was aware of a high probability that a statement was false and deliberately avoided learning the truth. *United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (en banc); *United States v. Hong*, 938 F.3d 1040, 1046-47 (9th Cir. 2019).~~ In addition, scienter may be proven by a showing of deliberate recklessness, which is an extreme departure from the standards of ordinary care presenting a danger of misleading investors, which is either known to the defendant or is so obvious that the defendant must have been aware of it. ~~*Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018);~~ *Hollinger*, 914 F.2d at 1569–70. Recklessness may be inferred from circumstantial evidence. *Platforms Wireless*, 617 F.3d at 1094 **(citing *Gebhart v. SEC*, 595 F.3d 1034, 1042 n.11)**. ~~*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).~~

111.    The Court finds that Heckele acted knowingly ~~and at least recklessly~~ with respect to the material misrepresentations and omissions made to investors.

112.    Heckele knew that the investments were highly speculative and that the underlying businesses were in their infancy, and it was an extreme departure from the standards of ordinary care to tout 100 percent or greater returns. The danger of misleading investors with such claims, especially claims suggesting that 100 percent returns were the minimum was ~~either~~ known to Heckele. ~~or so obvious that he must~~

22

1   ~~have been aware of it.~~

2       113.   As noted, Heckele ~~was aware~~ **knew** that any suggestion of a 100 percent

3   guarantee was misleading. His own emails to Lloyd demonstrate as much. But as

4   discussed with respect to the Section 17(a) claim, Heckele took no action to correct

5   misstatements even with actual knowledge that misstatements had been made to

6   investors.

7       114.   Apart from the statements by Lloyd and the sales agents, Heckele was

8   reckless with regard to the truth of his own statements to investors.

9       115.   With respect ECT1, Heckele knew, **as he admitted at trial,** ~~, or was~~

10  ~~reckless in not knowing~~ that ECT1 had no supply contracts, no sales contracts, no

11  machinery, and lacked a required environmental study to operate legally.  Yet in an

12  email to an investor, which included the PPM touting the 100 percent returns,

13  Heckele wrote that C-Quadrant had "everything in place, including permitting and

14  licensing (for distribution), production, and distribution. And, using only 'trim' from

15  its own farms, can operate at 20% capacity immediately." And in the Executive

16  Summary, Heckele stated that C-Quadrant "will begin operating at not less than 20%

17  capacity on day-one [*sic*] due to its Principals' current farming operations,

18  connections with local farmers, and in-place distribution network."

19      116.   With respect to GGV, Heckele knew~~, or was reckless in not knowing,~~

20  that Lloyd's own shares from the Valley View offering were not paying the 100

21  percent returns that Heckele included in the GGV PPM and in emails to investors.

22      117.   In addition, the Court concludes that Heckele ~~acted with deliberate~~

23  ~~ignorance regarding~~ **knew** the embedded statements in the projections **were false,**

24  **given** the actual performance of C-Quadrant and Zabala Farms. With C-Quadrant,

25  Heckele—based on his visit in early February, his knowledge about the lack of

26  permitting, and the updates he received from C-Quadrant during the course of the

27  offering—knew ~~there was a high probability~~ that C-Quadrant did not acquire an

28  operating farm and could not begin extracting oil in January 2018. ~~Yet~~ Heckele made

no attempt to ~~confirm the truth or to confirm~~ **conform the PPM with** C-Quadrant's actual financial performance during the course of the ECT1 offering. With GGV, Heckele knew that Zabala Farms had not turned a profit by the end of 2017, knew the greenhouses were not completed and fully under cultivation in early 2018, and knew by May 2018 that crop yields were less than 36 grams per square foot. Thus, he knew ~~there was a high probability~~ that his projections and the statements embedded within them were false, but he made no attempt to **correct the false statements in the PPM** ~~learn the truth~~.

118.    Accordingly, the Court concludes that Heckele violated Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

### D.    Section 20(a) of the Exchange Act

#### 1.    Elements

119.    For its claim under Section 20(a) the SEC must demonstrate by a preponderance of the evidence (1) a violation of the Exchange Act and (2) direct or indirect control by the defendant of the person[2] liable for the violation. *SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). The Court concluded at summary judgment that Heckele controlled both ECT1 and GGV for purposes of Section 20(a). The Court finds that the SEC has met its burden to establish a violation of the Exchange Act.

#### 2.    Exchange Act Violations by ECT1 and GGV

120.    A corporation acts through its officers, and the culpability of an entity's principals is imputed to the corporation. ~~See~~ ***Cf.*** *SEC v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008) **("The scienter of a corporation can be imputed from that of its officers.")**.

121.    The Court finds that Lloyd violated Section 10(b) and Rule 10b-5. As noted, the Court has already concluded that his statements in emails and sales scripts were materially misleading. The Court finds that Lloyd acted with scienter in making

---

[2] **A person under the Exchange Act includes a company. 15 U.S.C. § 78(c)(a)(9).**

these statements because he intended in his emails and sales scripts to imply that the 100 percent returns were the minimum investors could expect to receive, when, in fact, the returns were highly speculative and not in any way guaranteed. Lloyd's scienter is imputed to the entities because he is a co-manager of ECT1 and GGV. Accordingly, the Court finds that ECT1 and GGV violated Section 10(b) and Rule 10b-5.

### 3.   Heckele's Lack of Good Faith

122.   As an affirmative defense to Section 20(a) liability, Heckele claims to have acted in good faith. Heckele has the burden of proving by a preponderance of the evidence both that ~~(1) he did not directly or indirectly induce the violation and (2)~~ he acted in good faith. *Hollinger*, 914 F.2d at 1575–76. Heckele can prove good faith only by establishing that he maintained and enforced a reasonable and proper system of supervision and internal control. *Id.*

~~123.~~   The Court finds that Heckele failed to meet his burden ~~on both elements. First, Heckele failed to demonstrate the he did not directly or indirectly induce the violations. Heckele chose to include the 100 percent projected returns on the first page of the PPMs and in the ECT1 Executive Summary. Lloyd based his misrepresentations on Heckele's calculated projected returns.~~

124.   ~~Second, Heckele failed to demonstrate good faith.~~ As noted above, Lloyd shared the draft ECT1 sales script with Heckele, but Heckele did not attempt to correct the misstatements it contained. Lloyd also copied Heckele on emails that Heckele recognized were misleading, but Heckele did nothing to correct the misrepresentations for the investors to whom they had been made. Heckele implemented no internal controls or system of supervision within either ECT1 or GGV to review solicitation materials before they were provided to investors, even though Heckele was responsible for the entities' compliance with the securities laws.

125.   Because he controlled ECT1 and GGV, which violated Section 10(b) of the Exchange Act through Lloyd's knowing misrepresentations, Heckele is liable for

the entities' violations under Section 20(a).

### E.   Remedies

126.   Having concluded that the SEC has met its burden of proof on all claims, the Court now turns to the remedies for Heckele's violations. The SEC seeks permanent injunctions against violations of the pertinent securities laws, full disgorgement of the commissions he received along with prejudgment interest, and a civil penalty. The Court concludes that all requested relief is warranted.

### 1.   Permanent Injunctions

127.   Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that when the ~~evidence~~ **SEC** establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC. *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).~~*SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d at 1295-96~~.  Factors to be considered include the degree of scienter involved, the isolated or recurrent nature of the infractions, the defendant's recognition of the wrongful nature of his conduct, the likelihood that, based on the defendant's occupation, future violations might occur, and the sincerity of the defendant's assurances against future violations. *Murphy*, 626 F.2d at 655. The Court has considered these factors and finds a reasonable likelihood of a future violation of the securities laws.

128.   All of the factors weigh in favor of a permanent injunction. ~~Scienter, while a relevant factor, is not required to enter an injunction, especially of strict liability provisions such as Section 5 of the Securities Act and Section 15(a) of the Exchange Act. *See id.* In any event,~~ Heckele acted with scienter with respect to representations made to investors. The Court further finds that Heckele was reckless as to the registration violations as well. He had ~~at least some~~ awareness of the requirements regarding exempt offerings, but he made no effort to comply with those requirements. For the ECT1 offering, Heckele knew Lloyd had generated a list of

leads thousands of names long. He had no basis to believe that Lloyd had a substantive relationship with any of these people; indeed, he knew those leads were generated in the course of advertising investments in another unregistered offering. For the GGV offering, Heckele understood the requirements for verifying accredited investor status but chose to ignore those requirements. And with respect to the Section 15(a) requirements, Heckele's declaration reflects an understanding that the law restricted who could act as a broker-dealer and receive commission and that his 15 percent management fee was purposely structured in an unsuccessful attempt to avoid being characterized as a commission.

129.   Heckele has shown no recognition for the wrongfulness of his conduct. He instead tries to cast himself as nothing more than a glorified administrative assistant who was nevertheless entitled to half the transaction-based "management fee" collected from investor funds. Heckele's declaration of direct testimony contains no acknowledgement of wrongdoing even of the violations the Court had determined at summary judgment. Moreover, Heckele shows no recognition that forward-looking statements can be materially misleading under the securities laws. Heckele seems to think that the disclosures signed by investors—disclosures that inaccurately describe the nature of the representations made by Heckele, Lloyd, and their sales agents — somehow undo or negate the false and misleading statements. And as noted above, the Court finds that Heckele's sworn statements are entitled to little, if any weight. The Court accordingly finds that Heckele's assurances against future violations ring hollow.

130.   Finally, Heckele, with Lloyd, conducted other unregistered offerings of securities following the ECT1 and GGV offerings. Heckele's continued communications with investors and continued management of ECT1 and GGV, which includes negotiating securities transactions on behalf of ECT1, also increases the likelihood of future violations.

131.   Accordingly, the Court enters permanent injunctions for each violation.

1

## 2.     Disgorgement with Prejudgment Interest

2      132.   "A disgorgement award that does not exceed a wrongdoer's net profits

3   and is awarded for victims is equitable relief permissible under [15 U.S.C.]

4   § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020). After *Liu*, on January 1,

5   2021, Congress amended Exchange Act Section 21(d) to add new subsection (d)(7),

6   which expressly authorizes courts to award disgorgement in Commission actions. 15

7   U.S.C. § 78u(d)(7). *See* National Defense Authorization Act for Fiscal Year 2021,

8   Pub. L. No. 116-283. The SEC needs to produce only a reasonable approximation of

9   the defendant's ill-gotten gains. *See Platforms Wireless*, 617 F.3d at 1096. Once the

10   SEC establishes a reasonable approximation, the burden shifts to the defendant to

11   demonstrate the SEC's estimate is not reasonable. *Id.*

12      133.   Heckele does not dispute that he and Lloyd collected a 15 percent

13   transaction-based management fee from funds raised in the ECT1 and GGV

14   offerings, totaling $536,475, and they split those funds equally between them. The

15   Court finds that the SEC has met its burden of establishing that one-half of the

16   management fees raised from the ECT1 and GGV offerings, $268,237.50, is a

17   reasonable approximation of the amount to be disgorged~~, and the burden therefore~~

18   ~~shifts to Heckele to show that this amount is not reasonable~~.

19      134.   The Court finds that Heckele has failed to meet his burden to

20   demonstrate that the SEC's estimate is not reasonable. *See Platforms Wireless*, 617

21   F.3d at 1096. ~~Heckele has produced no documentary evidence of expenses the Court~~

22   ~~should deduct before ordering disgorgement. *See Liu*, 140 S. Ct. at 1950.~~ **Heckele**

23   **seeks to deduct expenses from the management fees he received. He deposited**

24   **the management fees into his company MAVES Holdings, LLC. He wishes to**

25   **deduct the feels he paid his sales agents.** ***See*** **Heckele Decl. ¶¶ 1–8, ECF No. 122-**

26   **1.** Defendants are not permitted to claim deductions for how they spent their ill-gotten

27   gains. *SEC v. Liu*, No. SACV 16-00974-CJC (AGRx), 2021 U.S. Dist. LEXIS

28   108071, at *24 (C.D. Cal. June 7, 2021) (such a "construction would permit the

perpetrator of a successful scheme, who was just as successful at dissipating the ill-gotten gains, to avoid a disgorgement order because at the time of the order, [they] had retained none of the proceeds from the scheme." (alteration in original) (quoting *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993))). ~~*see also SEC v. DiBella*, No. 3:04cv1342 (EBB), 2008 U.S. LEXIS 109378, at \*9 (D. Conn. Mar. 13, 2008) (finding that taxes are not direct transaction costs that courts may, in their discretion, deduct from the disgorgement amount), *aff'd*, 587 F.3d 553 (2d Cir. 2009); *SEC v. Zwick*, 2007 U.S. Dist. LEXIS 19045, at \*75 (S.D.N.Y. Mar. 16, 2007) (same), *aff'd*, 317 F. App'x 34 (2d Cir. 2008)).~~

135.   The Court finds that disgorgement also here satisfies both Section 21(d)(7) and the standard in *Liu* because a distribution to harmed investors is feasible, should the SEC collect any of the disgorgement award. There are a limited number of investors in this case, who are identified, along with the amounts of their investment.

136.   The Court further finds that prejudgment interest on the disgorgement amount is appropriate. Prejudgment interest ensures that wrongdoers do not profit from their illegal conduct. ~~*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972);~~ *SEC v. Cross Fin. Services*, 908 F. Supp. 718, 734 (C.D. Cal. Sept. 5, 1995). The Court concludes that the tax-underpayment rate is the appropriate interest rate to apply here. *See Platforms Wireless*, 617 F.3d at 1099.

137.   The Court will order Heckele to disgorge $268,237.50, together with prejudgment interest from October 1, 2018, through May 1, 2022, in the amount of $42,595.22, for a total of $310,832.72.

### 3.   Civil Penalty

138.   Civil penalties are meant to punish the individual wrongdoer and to deter him and others from future securities law violations. *SEC v. Lyndon*, 39 F. Supp. 3d 1113, 1123 (D. Haw. 2014). ~~*Kenton Capital, Ltd.*, 69 F. Supp. 2d at 17.~~ Because civil penalties are imposed to deter the wrongdoer from similar conduct in the future,

courts apply the factors set forth in *SEC v. Murphy* in assessing penalties: the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of the defendant's professional occupation, that future violations might occur; and the sincerity of the defendants' assurances, if any, against future violations. *Id.* at 1123–24.

139.   The Court has applied the *Murphy* factors and concludes that a civil penalty is appropriate here. As noted, Heckele acted with scienter and does not recognize the wrongful nature of his conduct; the violations were recurring throughout the offerings; and Heckele's assurances against future violations are not compelling.

140.   The Securities Act and Exchange Act each provide that penalties shall be assessed according to a three-tier system. For each tier, the Court may impose a penalty up to the "gross amount of pecuniary gain." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The third, or highest, tier applies to violations that: (1) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement"; and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

141.   The Court finds that the antifraud violations here satisfy the third-tier criteria. For each violation, the maximum third-tier penalty is the greater of (1) ~~$195,047~~ **$207,183** for a natural person for each violation occurring on or after November 3, 2015, or (2) the "gross amount of pecuniary gain" to the defendant as a result of the violation. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); *Adjustments to Civ. Monetary Penalty Amounts*, Release No. 33-11021 (Jan. 6, 2022). Accordingly, the Court will assess a penalty in the amount of ~~$195,047~~ **$207,183**. The Court notes that the assessed penalty amount is less than Heckele's "gross amount of pecuniary gain" resulting from his violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act.

**IV.    CONCLUSION**

 **The Court concludes that Plaintiff has violated Section 10(b)(5) and Rule 10b-5 of the Exchange Act, Section 17(a)(1), (2), (3) of the Securities Act, and Section 20(a) of the Exchange Act.**

 **The Court DENIES the SEC's Motion to Strike as moot based on the findings of fact above. ECF No. 127.**

 **The SEC shall file a proposed plan of distribution of disgorged funds within 30 days of Heckele paying the disgorged funds to the SEC.**

 ~~A separate final judgment will follow this Order.~~ **The Court has now found Defendant liable of all claims in the SEC's Complaint. The Court directs the Clerk to enter Judgment against Defendant and close the case.**

**IT IS SO ORDERED.**

Dated: June 29, 2022

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

31